# TABLE OF CONTENTS

I.     INTRODUCTION ...........................................................................................................1

II.    STATEMENT OF THE CASE.......................................................................................2

     A.    Background regarding Bedford Heights Jail.............................................................2

     B.    Facts. ........................................................................................................................4

          1.    Incident at Loew's and Omar Arrington-Bey's arrest. ............................. 4

          2.    Bey's detainment at Bedford Heights Jail. .............................................. 7

          3.    Bey's assault of Officers. ....................................................................... 10

III.   SUMMARY JUDGMENT STANDARD........................................................................11

IV.   LEGAL ANALYSIS.....................................................................................................12

     A.    To Establish the §1983 Fourteenth Amendment Violation, Plaintiff Must Show that the individual Bedford Heights Defendants Acted with Deliberate Indifference to a Serious Medical Need...............................................12

     B.    The evidence fails to establish a sufficiently serious medical need or that the individual Officers acted with criminal recklessness by consciously disregarding a substantial risk of serious harm......................................................14

          1.    Officers Ellis and Chow did not observe a sufficiently serious medical need or consciously disregard a substantial risk of serious harm. ......................................................................................................... 15

          2.    Officer Honsaker did not observe a sufficiently serious medical need and did not consciously disregard a substantial risk of serious harm. ................................................................................................... 16

          3.    Officers Lee and Hill did not observe a sufficiently serious medical need and did not consciously disregard a substantial risk of serious harm. ......................................................................................................... 18

          4.    Assistant Chief Leonardi did not observe a sufficiently serious medical need prior to the assault and did not consciously disregard a substantial risk of serious harm.................................................................19

          5.    Officers Mudra and Sindone did not observe a sufficiently serious medical need and did not consciously disregard a substantial risk of serious harm....................................................................................... 19

          6.    Conclusion for individual Bedford Heights Officers................................ 20

i

C.       The individual Bedford Heights Officers are entitled to Qualified Immunity on the §1983 claims. ...................................................................................21

D.       The *Monell*/official capacity claims against the City of Bedford Heights fail as a matter of law. ...................................................................................23

E.       As to the state law claims, the Bedford Heights Defendants are entitled to immunity under R.C. Chapter 2744....................................................................26

      1.      The City of Bedford Heights is entitled to R.C. Chapter 2744 immunity. ...................................................................................26

      2.      The individual Bedford Heights Officers are entitled to R.C. Chapter 2744 immunity. ...................................................................................29

F.       The state law claims fail on the merits.................................................................32

G.       Punitive damages cannot be assessed against the City of Bedford Heights due to its status as a political subdivision and pursuant to R.C. 2744.05(A).........34

CONCLUSION.....................................................................................................................35

CERTIFICATE OF SERVICE ............................................................................................36

ii

# TABLE OF AUTHORITIES

## Cases

*Albright v. Oliver* (1994), 510 U.S. 266, 273 ............................................................ 13

*Anderson v. Creighton,* 483 U.S. 635 (1987) ............................................................ 22

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ...................................... 12

*Anderson v. Massillion*, 134 Ohio St. 3d. 380, 2012-Ohio-5711 .............................. 30

*Anderson v. St. Francis-St. George Hosp. Inc.* (1996), 77 Ohio St.3d 82, 84-85 ...... 32

*Bd. of Cty. Commrs. of Bryan Cty. v. Brown*, 522 U.S. 397, 403-404 (1997) ........ 23, 25

*Berry v. City of Detroit*, 25 F.3d 1342, 1345, (6th Cir., 1994) .............................. 24, 25

*Bilicic v. Brake* (1989), 64 Ohio App.3d 304, 307 .................................................... 33

*Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir.2004) ............................ 13

*Bryant v. Commonwealth of Kentucky*, 490 F.2d 1273, 1274 (6th Cir.1974) .............. 12

*Burgess v. Fischer*, 735 F.3d 462 (6th Cir., 2013) ..................................................... 13

*Bush v Cleveland Municipal School District*, 8th Dist. No. 99612, 2013-Ohio-5420 ........ 27

*Cameron v. City of Pontiac*, Mich., 813 F.2d 782, 786 .............................................. 14

*Canton* v. *Harris*, 48 U.S. 378 (1989) ................................................................... 23, 25

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) .............................................. 12

*City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981) ...................................... 34

*Colbert v. Cleveland* (2003), 99 Ohio St. 3d 215 ....................................................... 27

*Cook v. Cincinnati*, 103 Ohio App.3d 80, 90 (1995) .................................................. 29

*Doe v. Dayton City School Dist. Bd. of Educ.* (1999)*, 137 Ohio App.3d 166, 169 .............. 28

*Dotson v. Wilkinson*, 477 F. Supp. 2d 838 (N.D. Ohio, 2007) .................................... 13

*Estate of Harvey v. Roanoke City Sheriff's Office*, 585 F.Supp.2d 844, (W.D.Vir., 2008) .... 21, 22

*Estate of Sowards v. Trenton*, 125 Fed.Appx. 31 (6th Cir., 2005) .............................. 25

*Farmer v. Brennan*, 511 U.S. 825, 832 (1994) ................................................................. 12, 13, 14

*Feliciano v. Cleveland*, 988 F. 2d 649, 655 (6th Cir., 1993) ........................................... 24, 25

*Franks v. Lopez* (1994), 69 Ohio St.3d 345, 347 ................................................................. 27

*Frazier v. City of Kent*, 9th Dist. No. 2004-P-0077, 2005-Ohio-5413 ................................ 28

*Gagne v. Northwestern National Ins. Co.*, 881 F.2d 309, 315-16 (6th Cir.1989) ............... 12

*Garvie v. Jackson,* 845 F.2d 647 (6th Cir., 1988) ............................................................... 22

*Gibson v. Matthews*, 926 F.2d 532, 535 (6th Cir.1991) ....................................................... 14

*Goodwin v. Kochevar*, 2007 WL 3244177, (N.D.Ohio, 2007) ............................................ 14

*Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982) ................................................................. 21

*Harris v. Sutton*, 183 Ohio App.3d 616, 622, 2009-Ohio-4033 .......................................... 29

*Howard v. Miami Twp. Fire Div.*, 119 Ohio St. 3d. 1, 2008-Ohio-2792 .............................. 28

*Johnson v. Karnes*, 398 F. 3d 868, 873 (6th Cir. 2005) ....................................................... 13

*Kentucky v. Graham*, 473 U.S. 159 (1985) .......................................................................... 34

*Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ................................................................ 24

*M.B. v. Elyria City Bd. of Educ.*, 9th App. Dist., 05CA008831, 2006-Ohio-4533. ............ 29

*Maddox v. E. Cleveland*, 8th Dist. No. 92673, 2009-Ohio- 6308, at ¶13 ............................ 27

*Mann v. Taser Intern., Inc.*, 588 F.3d 1291. (11th Cir., 2009) ..................................... 20, 22

*Mayes v. Columbus* (1995), 105 Ohio App.3d 728 ............................................................... 29

*Menifee v. Ohio Welding Products, Inc.* (1984), 15 Ohio St.3d 75, 77 ................................ 32

*Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584-85 (6th Cir.1992) ......................................... 12

*Monday v. Oullette,* 118 F.3d 1099 (6th Cir., 1997) ............................................................ 21

*Monell v. Dept. of Social Serv.*, 436 U.S. 658 (1978) ..................................................... 23, 24

*O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574 ................................................ 30

*Peet v. Detroit*, 502 F.3d 557, 566 (6th Cir., 2007) ...................................................... 24

*Pray v. Sandusky*, 49 F.3d 1154, 1157(6th Cir., 1995) ................................................... 21

*Pylypiv v. Parma*, 8th Dist. No. 85995, 2005-Ohio-6364, at ¶31 ................................. 32

*Ranells v. City of Cleveland* (1975), 41 Ohio St. 2d 1, 6-7 ........................................... 35

*Sibley v. Zimmerman*, 4th Dist. No. 97 CA 51, 1998 WL 548755, at 9 ....................... 32

*Sims v. Cleveland*, 8th Dist. No. 92680, 2009-Ohio-4722 ............................................. 28

*Slone v. Judd*, not reported, 2011 WL 1124618 (M.D.Fla., 2011) ......................... 20, 22

*Spires v. City of Lancaster* (1986), 28 Ohio St. 3d 76, 79 ........................................... 35

*St. Louis v. Praprotink*, 485 US 112, 127 (1988) ........................................................ 24

*Strother v. Hutchison* (1981), 67 Ohio St.2d 282, 287 ................................................. 33

*Theobald v. Board of Cty. Com'rs of Hamilton Cty.*, 332 F.3d 414, 416 (6th Cir., 2003) ........... 26

*Thompson v. Germantown Cemetery*, 188 Ohio App. 3d 132, 2010-Ohio-1920 ....................... 34

*Trader v. Cleveland*, 8th Dist. No. 86227, 2006-Ohio-295, at ¶10 ............................... 27

*Waters v. Morristown*, 242 F. 3d 353, 361 (6th Cir., 2001) ......................................... 24

*Wegvener v. Covington*, 933 F. 2d 390, 392 (6th Cir., 1991) ....................................... 21

*Woodward v. City of Gallitin, Tenn.*, not reported, 2013 WL 6092224 (M.D.Tenn, 2013) ... 20, 22

*Young v. Mahoning Cty.* (N.D.Ohio, 2005), 418 F.Supp.2d 948 .................................... 24

## Statutes

42 U.S.C. §1983 ................................................................................................................ 1

Fed.R.Civ.Pro. 56 .......................................................................................................... 11

R.C. §§ 2125.01 ............................................................................................................. 32

R.C. 2744.01 .................................................................................................................. 27

R.C. 2744.02 ............................................................................................................ 27, 28

R.C. 2744.03 .......................................................................................................... 27, 29, 30, 32

R.C. 2744.05 .......................................................................................................... 2, 34

**BRIEF IN SUPPORT**

## I.  INTRODUCTION

The claims of Plaintiff Anita Arrington-Bey, Administratrix of the Estate of Omar K. Arrington-Bey, arise out of Omar Arrington-Bey's death following his assault on correctional officers at the Bedford Heights Jail.  Plaintiff attempts to assert claims against the City of Bedford Heights and Bedford Heights Officers Tim Honsaker, Maurice Ellis, Phillip Chow, David Leonardi, Jeffrey Mudra, Cheryl Sindone, Cynthia Lee, and Carolyn Hill in their individual and official capacities, (collectively "Bedford Heights Defendants").[1]

Specifically, the Second Amended Complaint attempts to assert a 42 U.S.C. §1983 claim for alleged violations of the Eighth and Fourteenth Amendments to the United States Constitution against the individual Bedford Heights Officers.  The Second Amended Complaint also attempts to assert a *Monell* claim against the City of Bedford Heights and the Officers in their official capacities. Finally, as to all Bedford Heights Defendants, the Second Amended Complaint attempts to assert state law claims for willful, wanton, reckless, and/or negligent conduct, as well as wrongful death and survivorship actions.

The Bedford Heights Defendants are entitled to summary judgment on all claims for the following reasons:

- The Bedford Heights Officers did not act with deliberate indifference to a serious medical need and, thus, there was no constitutional violation.

- The Bedford Heights Officers are entitled to qualified immunity as to the §1983 claims.

- The *Monell* official capacity claims fail as a matter of law because there is no underlying constitutional violation.

---

1. Plaintiff also asserts separate claims against Dr. Arnold Feltoon as an independent contractor providing medical services at the Bedford Heights jail.

1

- The *Monell* official capacity claims fail as a matter of law because there is no evidence that a policy, practice, or custom of Bedford Heights or a deliberate indifference to a lack of training/supervision was the direct cause of any claimed constitutional violation.

- The state law claims fail as a matter of law as the City of Bedford Heights and the Bedford Heights Officers are entitled to R.C. Chapter 2744 immunity.

- The state law claims fail on the merits as the duty and proximate cause elements have not been met.

- Punitive damages cannot be assessed against the City of Bedford Heights due to its status as a political subdivision and pursuant to R.C. 2744.05(A).

For these reasons, the Bedford Heights Defendants are entitled to summary judgment as a matter of law, and all claims against them should be dismissed.

## II.    STATEMENT OF THE CASE

### A.    Background regarding Bedford Heights Jail

Bedford Heights Jail is a full service jail facility.  (D. Leonardi Depo., relevant portions attached as Ex. A, at pp. 19-20.)  Bedford Heights jail contracts with Dr. Arnold Feltoon to provide the jail with medical services.  (Id. at p.34.)  Under the medical service contract, Dr. Feltoon provides administrative supervision of medical services, inmate care and treatment, maintenance and review of inmate medical records, development and review of medical protocol/policies, and oversight of nurse and correctional officer training on medical protocol/policies.  (A. Feltoon Depo., relevant portions attached as Ex. B, at pp. 27-29; 32-36.)

Bedford Heights Jail also provides on-site nurses for medical care and treatment of inmates. (D. Leonardi Depo., Ex. A, at pp. 27-28; L. DeLuca Depo., portions attached as Ex. C, at pp. 13-14.)  The nurses evaluate inmate medical complaints, provide inmate medical information to Dr. Feltoon, and assist in providing inmates with medical care.  (L. DeLuca Depo., Ex. C, at pp. 13-

14.)  As part of the medical care provided, nurses would respond to medical emergencies at the jail.  (Id. at pp. 29-30.)

Bedford Heights Jail also has in place appropriate policies and procedures with respect to offender intake, inmate healthcare, and the handling of inmate pharmaceuticals.  The policies state that the jail is to identify offenders requiring special management "at the time of intake, or as soon thereafter as possible."  (Aff. of D. Leonardi, attached as Ex. D, with Policy 3.2.5 - Institutional Services Classification: Special Needs offenders.)  The policies describe severely disturbed or mentally ill offenders in need of special management as those "who present a danger to themselves or others or are incapable of attending to basic physiological needs because of a mental or emotional problem." (Id.)  Under the policies, the jail provides care through Recovery Resources for mental health care intervention to inmates in need of mental health services.  (Id., with attached Policy 4.1.7 – Health Care Mental Health Care: State Standard.)

In accord with its policies, the Bedford Heights Jail provides an intake booking process for offenders entering the jail, which includes a medical and mental health screening.  (A. Feltoon Depo., Ex. B, at pp. 61-66, *with attached Depo. Exhibit 1, initial screening form*.)  The purpose of the initial screening is to determine whether there is there is going to be a mental or medical problem that will need to be addressed.  (Id.)  The initial screening form expressly inquires as to whether the inmate has seen a medical provider for a psychiatric condition or is taking prescribed psychiatric medications.  (Id.)

The Bedford Heights jail policies also address the safe, secure use of prescription medications.  Offenders entering the jail in possession of medication are permitted to continue taking the medications only after verification by the medical staff of need, ownership, and content of the prescription.  (Leonardi Aff., Ex. D, with attached Policy 4.1.3 – Health Care Medical

3

Services.)  If an inmate enters the jail with loose pills of an unsubstantiated nature, the medical staff would attempt to verify the nature and reason for the pills and then proceed with the aforementioned verification process.  (L. Deluca Depo., Ex. C, at 66-67.)

In addition, Bedford Heights Correctional Officers receive appropriate medical training.  A jail nurse provides annual training and testing for Correctional Officers relating to medical emergencies, passing medications, infection control, and suicide prevention.  (Id. at 46; 71-73.)  The suicide prevention training includes training relating to mental health issues.  (Id. at 75.)  The training includes a formal curriculum with written and video materials.  (Id. at 71-73.)  Once the nurse completes the training, Correctional Officers are tested on the curriculum via a written exam.  (Id. at 77.)

### B.  Facts.

#### 1.  Incident at Loew's and Omar Arrington-Bey's arrest.

On the morning of June 21, 2013, Plaintiff was driving Omar Arrington-Bey ("Bey") to school.  (A. Arrington-Bey Depo., Ex. E, at p. 42.)  Bey requested that they first stop at the Bedford Heights Lowe's store – his former place of employment – to pick up his paycheck.  (Id.)  Plaintiff proceeded to drive Bey to Lowe's.  (Id. at 46-47.)

Plaintiff parked in the Lowe's parking lot and Bey continued by himself into the store.  (Id. at 46-47.)  Russell Nelson was the Assistant Store Manager on duty when Bey entered the Lowe's.  (R. Nelson Depo., portions attached as Ex. F, at p. 5.)  Nelson testified that Bey had previously been terminated from his employment with Lowe's due to attendance issues.  (Id. at 10.)

After entering the store, Nelson approached Bey and asked if he could help him with anything, and Bey responded no.  (Id. at 12-13.)  According to Nelson, Bey then began to talk

disjointedly about selling gloves to Lowe's.  (Id.)  Nelson testified that Bey was calm and Nelson attempted to lead Bey out of the store.  (Id. at 13-14.)

Once outside of the store, Bey told Nelson that he wanted his $200 paycheck.  (Id.)  When Nelson told Bey that he would have another employee contact him about the paycheck, Bey yelled he wanted his money and proceeded back into the store. (Id. at 18-19.)  Inside the store, Bey jabbed at Nelson to get him away and then began kicking and throwing cans of stain as he walked down a store aisle.  (Id. at p. 20-21.)  Nelson called 911 and followed Bey down the aisles toward a commercial lumber entrance/exit area.  (Id. at 22.)

The initial 911 call from Lowe's was received from Bedford Heights Police Department dispatchers at 9:27 a.m.  (T. Honsaker Depo., portions attached as Ex. G, at p. 16.)  Bedford Heights Police Officers Honsaker and Ellis responded to the dispatch call.  (M. Ellis Depo., portions attached as Ex. H, at p. 26.)  Dispatch informed the Officers that Bey was out of control and damaging property at the Lowe's.  (T. Honsaker Depo., Ex. G, at pp. 23-27.)  As Officer Honsaker entered the Lowe's parking lot, he received different descriptions of the clothing worn by Bey.  (Id.)  The various descriptions were the result of Bey changing his clothing in an attempt to avoid identification.  (Id.)

Officer Honsaker spoke with a Lowe's employee in the parking lot who informed him that Bey had left in a blue or black Mercury.  (Id. at 27-29.)  Officer Honsaker saw a dark colored Mercury matching the employee's description leaving the parking lot and followed it.  (Id.)  Officer Honsaker stopped the suspect vehicle on Miles Road, in Bedford Heights, Ohio.  (Id. at p. 29.)  Officers Ellis was also on scene to assist Officer Honsaker.  (Id. at p. 32.)

Officers Ellis and Honsaker approached Plaintiff's vehicle from the passenger side.  (Id. at pp. 32-33.)  Officer Honsaker observed Bey in the front passenger seat and his clothing matched

the last description received.  (Id. at p. 33.)  Bey was slouched down in the passenger seat and Plaintiff was in the driver's seat.  (Id.)

Initially, Bey was evasive and told Officer Honsaker that he should be looking for a male in a red shirt.  (Id. at p. 35.)  Officer Honsaker explained to Bey that he was informed the male suspect from Lowe's removed a red shirt and was now wearing a white tank top matching what Bey was wearing. (Id. at p. 35.)  Officer Ellis then asked Bey to step out of the vehicle and Bey complied.  (Id. at p. 36.)

Bey was patted down, handcuffed, and detained.  During the pat-down, Officers Honsaker and Ellis discovered miscellaneous pills in a container.  (M. Ellis Depo., Ex. H, at pp. 40-41.)  Bey told Officer Ellis that the pills were to help him sleep.  (Id.)  The pills were then placed back in Bey's pocket.  (A. Arrington-Bey Depo., Ex. E, at p. 53.)  Officer Ellis then approached Plaintiff and asked for Bey's address and social security number.  (Id. at pp. 53-54.)  Plaintiff provided the requested information and told Officer Ellis that Bey was bipolar.  (Id.)  Officer Ellis asked Plaintiff what kind of medication Bey was on.  (Id.)  According to Plaintiff she informed Officer Ellis that Bey was on Seroquel.  (Id.)  Plaintiff also informed Officer Ellis that Bey had not been taking his medication.  (Id. at 55.)  Plaintiff then returned to the Lowe's parking lot while the Officers continued their investigation.  (Id.)

While Plaintiff waited in her car in the Lowe's parking lot, Bey was detained in the back of Officer Honsaker's cruiser.  (Id.)  Officer Honsaker testified that while waiting in the Lowe's parking lot, Bey was talking nervously and non-stop.  (T. Honsaker Depo., Ex. G, at p. 47.)  At one point, an unknown individual approached the cruiser and asked if the individual the Officers were looking for had a gun.  (Id. at 65.)  Bey swore at the individual and told him to leave.  (Id.)  Bey indicated to Officer Honsaker that he was agitated by Plaintiff's presence in the parking lot.

6

(Id. at pp. 46-47.)  As a result, Officer Honsaker approached Plaintiff's vehicle and asked that she leave the parking lot.  (Id. at pp. 47-48.)  According to Plaintiff, she informed Officer Honsaker that Bey is bipolar and has not been taking his medication.  (A. Arrington-Bey Depo., at p. 55.) Plaintiff then left the parking lot. (T. Honsaker Depo., Ex. G, at p. 54.)

After the investigation was concluded, Officer Honsaker transported Bey to the Bedford Heights jail.  (Id. at 18-19.)  Officer Honsaker testified that, while in the cruiser, Bey would ramble and talk about random topics such as inventing a kind of marijuana, his father being a son of the devil, injuring an ankle or foot, being famous on the internet, and being a millionaire.  (Id. at 62-63.)  The actions of Bey did not indicate to Officer Honsaker that Bey was suffering from a psychiatric issue.   (Id. at 49)

## 2.    Bey's detainment at Bedford Heights Jail.

Correctional Officers Lee and Hill received Bey at the jail.  (C. Hill Depo., portions attached as Ex. I, at pp. 37-38.)  Officer Hill described Bey as agitated with Officer Honsaker due to his arrest.   (Id.)   Officer Honsaker told Officer Chow, who had overheard Bey talking disjointedly, that Bey had been rambling in the cruiser.  (P. Chow Depo., portions attached as Ex. M, at p. 33; 37.)  Officer Honsaker also told Officer Hill that Bey had been rambling and talking nonsense in the back of the cruiser.  (C. Hill Depo., Ex. I, at p. 37.) Officer Hill decided to delay booking and screening Bey due to his agitated state and because only two female correctional officers were available to book Bey.  (Id. at 39.)   As a result, Bey was placed in a holding cell until he calmed down.  (Id. at pp. 39-40.)  The miscellaneous pills were brought to the booking area and held with Bey's property until a nurse was available to identify the pills and verify a prescription for the pills.  (Id. at 44.)

7

Once in the holding cell, Bey's cuffs were removed and so was his belt.  (Id. at 47.)  Officer Hill stated that Bey danced and acted like he was performing a striptease. (Id.)  Officer Hill asked Bey to stop and he complied.  (Id.)  Officer Hill did not find Bey's behavior abnormal or unusual. (Id.)  While in the holding cell, Bey sat and talked to himself; flirted with the female correctional officers; talked about a $1 million song or contract he was involved in; was singing and rapping, and kicked the cell door a few times.  (Id. at 53-54.)  Officer Hill did not consider Bey's conduct to be a behavioral problem which was indicative of a mental health problem.  (Id. 39; 53-54.)

Officer Lee did not witness Bey talking incoherently or rambling.  (C. Lee Depo., portions attached as Ex. J, at p. 51-52.)  Officers Lee and Hill did hear Bey kick his cell door.  (Id.)  When asked to stop kicking the door, Bey would comply. (Id.)  Officer Lee was aware that Bey had miscellaneous pills on his person when he came into the jail.  (Id.)  Officer Lee did not ask Bey about the pills as there was no nurse on duty at that time.  (Id.)

At one point, Bey began yelling, kicking his cell door, and banging a cup on the wall because he wanted to use the restroom.  (T. Honsaker Depo., Ex. G, at pp. 72-74.)   Because there were two female correctional officers on duty, Officer Honsaker was contacted to assist and bring Bey to the restroom.  (C. Hill Depo., Ex. I at p. 54.)  Assistant Chief Leonardi, Officer Honsaker, and Officer Chow brought Bey to the restroom.  (T. Honsaker depo., Ex. G, at pp. 72-74.)  Bey explained that he was upset because he had requested to use the restroom thirty minutes before, but did not receive a response.  (Id.)  Bey told Officer Chow that he wanted his cell phone because there was a million dollar plan on it.  (P. Chow Depo., Ex. M, at 43-44.)  Bey was also agitated because Officer Honsaker was watching him while using the bathroom.  (T. Honsaker Depo, Ex. G, at 72-74.)  In response, Bey used his hand to shake his penis and asked Officer Honsaker if he would like to hold it for him.  (Id.)  Bey then finished using the restroom and was escorted back to

8

the holding cell.  (Id.)  Bey at this point was no longer agitated and thanked the Officers for allowing him to use the restroom.  (Id. at pp. 74-75.)

At approximately 3:00 p.m.., Correctional Officers Sindone and Mudra began their shift and relieved Officers Lee and Hill.  (C. Sindone Depo., portions attached as Ex. K, at p. 19; J. Mudra Depo., portions attached as Ex. L, at p. 21.)  From her station in the control room, Officer Sindone could hear Bey rambling and talking about wanting to eat, using the bathroom, and wanting to go home. (C. Sindone Depo., Ex. K, at pp. 27; 31.) However, Officer Sindone observed that after a period of time Bey calmed down and was quiet in his cell.  (Id. at p. 41.)  Bey was then served food.  (Id. at pp. 44-46.)  Officer Sindone recalls that Bey used his hands to eat the food, but believes this was because they did not provide him with utensils.  (Id.)  Officer Sindone did not consider Bey's actions as unusual or a sign that he was suffering from a medical emergency. (Id. at 41; 44-46.)

Officer Mudra recalls hearing Bey sing while in the holding cell and saw him doing push-ups.  (J. Mudra, Depo., Ex. L, at pp. 27-28; 51.)  Officer Mudra did not find Bey's behavior to be unusual.  (Id.)  Officer Mudra informed Bey that they would be getting him booked and processed shortly.  (Id.)  Bey then became quiet and calm in the holding cell.  (Id.)

At around 3:30 p.m., Officer Mudra removed Bey from the holding cell and proceeded to book and process Bey.  (J. Mudra Depo, Ex. L, at p. 36.)  The booking process included the completion of Bey's initial medical screening.  (Id. at pp. 39-40, *with attached depo exhibit Bey initial medical screening form*.)  Bey responded "no" to inquiries regarding whether he had seen a doctor for any psychiatric issues or was taking medication for a psychiatric condition.  (Id.)  Throughout the booking process, Bey was compliant and cooperative.  (Id. at 37; Leonardi Aff.,

Ex. D, with attached Jail Video Footage, see video files 2 and 3 Bey's Booking.) After booking was complete, Officer Mudra returned Bey to the holding cell. (Id. at 50.)

### 3. Bey's assault of Officers.

At around 6:30 p.m., Officer Mudra asked Bey if he would like to make a phone call because he wanted to see Bey bonded out. (Id. at 51.) Bey replied that he would like to make the phone call. (Id.) Officer Mudra took Bey out of the interview cell and walked with him approximately 20 to 25 feet to the booking desk where a phone was available. (Id. at pp. 52-54.) Bey was not handcuffed as Officer Mudra did not perceive him as a threat. (Id.) Bey inquired as to where his cellphone was and Officer Mudra told him he did not know. (Id.) According to Officer Mudra, Bey became agitated and decided that he wanted to go back to his cell rather than make a phone call. (Id.) As they walked back to the holding cell, Bey stopped, looked at Officer Mudra and told him he could break a man's neck seventeen different ways. (Id.) Officer Mudra told Bey that he didn't need to make that statement and he was going to try to find out where the cellphone was. (Id.) They stopped walking and Bey without warning suddenly grabbed Officer Mudra by the neck and slammed him to the floor. (Id. at pp. 54; 57; Leonardi Aff., Ex. D, with attached Jail Video Footage, video files 4 and 5 of Booking Area and Altercations.) Bey began choking Officer Mudra while on the ground. (Id.)

After calling for assistance, Officer Sindone left the control room and attempted to assist Officer Mudra. (C. Sindone Depo., Ex. K, at p. 52.) Officer Sindone jumped on Bey's back in an attempt to assist Officer Mudra. (Id. at 53.) Bey proceeded to pin Officer Sindone on the ground and began choking her in addition to choking Officer Mudra. (Id.)

Assistant Chief Leonardi as well as other police officers responded and entered the jail area. (D. Leonardi Depo., Ex. A, at pp. 93-94.) Assistant Chief Leonardi and the other officers

10

forcibly removed Bey from Officers Mudra and Sindone.  (Id. at pp. 98-104.)  Bey continued to resist the Officers' attempts to gain control and subdue him.  (Id.)  Ultimately, Bey was handcuffed with his hands in front of his body and placed in a restraint chair.  (Id.)

Bey did not stop resisting until he was placed in the restraint chair.  (Id.)  When placed in the restraint chair, Bey's body remained in an upright position and the handcuffs were removed. (Id. at pp. 107-108.) Assistant Chief Leonardi detected a problem and asked an Officer to check Bey's pulse.  (Id.)  The Officer reported a weak pulse.  (Id.)  Assistant Chief Leonardi then immediately ordered that the Officers take Bey out of the restraint chair and placed on the floor in a prone position.  (Id.)  Assistant Chief Leonardi had an emergency squad called for medical assistance.  (Id.)  An Officer immediately began to provide Bey with resuscitation efforts and an AED device was used.  (Leonardi Aff., Ex. D, with attached Jail Video.) Emergency responders arrived and continued providing resuscitation efforts.  (Id.)  Bey was taken to the hospital and later pronounced dead.  (Id.)

An autopsy of Bey was performed.  The coroner's opinion was that Bey died as a result of a sudden cardiac event during a physical altercation in association with bipolar disease.  The coroner found that Bey's increased weight and coronary artery anatomy placed him at increased risk of such a cardiac event during the assault.  (Autopsy Report attached as Ex. N.)

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the evidence in the record shows that there is no genuine dispute of material fact and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.Pro. 56(c).  When moving for summary judgment, an adverse party may not rest upon the mere allegations or a denial of the adverse party's pleading.  Fed.R.Civ.Pro. 56(e). Instead the non-moving party must set forth specific facts showing there is a genuine dispute of

11

material fact for trial. *Id.* A fact is material only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In these situations there can be no genuine dispute as to any material fact, since a failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Id.*

Mere conclusory or factually unsupported allegations are insufficient to withstand a motion for summary judgment. *Gagne v. Northwestern National Ins. Co.*, 881 F.2d 309, 315-16 (6th Cir.1989); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584-85 (6th Cir.1992) (statements amounting to rumors, conclusory allegations and subjective beliefs insufficient to defeat summary judgment). Indeed, speculation ungrounded in fact is insufficient to withstand a motion for summary judgment. *Bryant v. Commonwealth of Kentucky*, 490 F.2d 1273, 1274 (6th Cir.1974) ("mere conclusory and unsupported allegations, rooted in speculation" do not meet burden to withstand summary judgment). For the reasons that follow, the Bedford Heights Defendants are entitled to summary judgment on all claims.

## IV.    LEGAL ANALYSIS

### A.    To Establish the §1983 Fourteenth Amendment Violation, Plaintiff Must Show that the individual Bedford Heights Defendants Acted with Deliberate Indifference to a Serious Medical Need.

The Eighth Amendment of the Constitution imposes a duty on prison officials to provide humane conditions of confinement, including the provision of adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The Due Process Clause of the Fourteenth Amendment makes

12

these rights applicable to pretrial detainees, such as Bey.  *Johnson v. Karnes*, 398 F. 3d 868, 873 (6th Cir. 2005).  A pre-trial detainee's claim for lack of medical care is properly brought under the Fourteenth Amendment[2], but is analyzed under the same Eighth Amendment standard.  *Dotson v. Wilkinson*, 477 F. Supp. 2d 838 (N.D. Ohio, 2007).  Under this standard, a pre-trial detainee's right to have adequate medical care is violated only when a correctional officer has a sufficiently culpable state of mind.  *Farmer*, supra, at 834.  In jail conditions cases, the requisite state of mind is one of deliberate indifference to an inmate's serious medical needs.  *Id*. at 834.

The plaintiff has the burden to prove that a defendant correctional officer acted with deliberate indifference to the inmate's medical needs.  *Id*.  The deliberate indifference standard requires the plaintiff to prove two components, an objective component and a subjective component.  *Id*.

To satisfy the objective prong, the plaintiff must establish that the medical need at issue is sufficiently serious.  *Id*. at 837.  A serious medical need "is sufficiently serious if it has been diagnosed by a physician that has mandated treatment or it is so obvious that even a lay person would easily recognize the need for medical treatment."  *Burgess v. Fischer*, 735 F.3d 462 (6th Cir., 2013), citing *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir.2004).

To satisfy the subjective prong, the plaintiff must show that each individual defendant had a sufficiently culpable state of mind in that he or she knew of and disregarded a detainee's serious medical need.  *Id*. at 837.  "That is the plaintiff must show that the individual defendant officer had knowledge of facts from which the inference could be drawn that a substantial risk of serious harm exists, and the defendant correctional officer *must actually have drawn* that inference.  *Id*. (emphasis added).

---

2. Because Plaintiff's claims are to be brought expressly under the Fourteenth Amendment, the Eighth Amendment claim fails as a matter of law. *Albright v. Oliver* (1994), 510 U.S. 266, 273.

A defendant officer acts with deliberate indifference when "he acts with criminal recklessness," a state of mind that requires that the defendant correctional officer act with conscious disregard of a substantial risk of serious harm. *Goodwin v. Kochevar*, 2007 WL 3244177, (N.D.Ohio, 2007), citing *Farmer*, supra, at 837. If the plaintiff cannot demonstrate this high level of mental culpability, the §1983 claim fails as a matter of law. *Farmer*, supra; *Goodwin* supra.

Moreover, "personal liability on any of the defendants ... must be based on the actions of that defendant in the situation that the defendant faced, and not based on any problems caused by the errors of others...." *Gibson v. Matthews*, 926 F.2d 532, 535 (6th Cir.1991). As a result, the deliberate indifference standard requires that the plaintiff show that *each individual* defendant officer had the requisite level of mental culpability based upon the facts and circumstances known to that officer. *Id*.

Finally, Plaintiff must also demonstrate that the alleged constitutional violation was the proximate cause of Bey's death. *Cameron v. City of Pontiac*, Mich., 813 F.2d 782, 786. Indeed, the unforeseeable assault by Bey acts as an intervening event which breaks any causal link to his death. *Id*.

> **B.** **The evidence fails to establish a sufficiently serious medical need or that the individual Officers acted with criminal recklessness by consciously disregarding a substantial risk of serious harm.**

The evidence fails to establish that Bey's medical issues were sufficiently serious as his behavior, particularly in a jail setting, would not have indicated to a lay person there was a need for emergency medical treatment. Moreover, the facts known by each individual Bedford Heights Officer do not show that they acted with the high level of mental culpability necessary to demonstrate they acted with deliberate indifference to a substantial risk of serious harm. The

14

evidence shows that Bey at times rambled about miscellaneous topics; was occasionally agitated; made sporadic crude comments to Officers; and used his hands to eat.  These intermittent actions are common in a jail setting and do not indicate a mental emergency requiring immediate medical care. Moreover, Bey's sudden and unexpected assault destroys any tenuous causal link between the alleged constitutional violation and Bey's death.

In response to Bey's initial agitated behavior at the time of his arrest and jail entry, the Officers took appropriate steps allowing Bey to calm down in a holding cell.  Once he became calm, Bey was processed and booked without issue. Bey was calm and compliant throughout the booking process.  When returned from his cell after the booking in which he denied any history of mental health treatment, Bey did not show signs of any medical distress.  Later that afternoon, Bey was again compliant when escorted by Officer Mudra to make a phone call.  Suddenly and without warning, Bey attacked Officer Mudra.

Neither this unforeseeable attack nor Bey's sudden cardiac event were the result of an observable serious medical need or a criminally reckless disregard for Bey's medical care. Accordingly, and as will be established further below, the evidence fails to establish a sufficiently serious medical need or that the individual Officers acted with criminal recklessness by consciously disregarding a substantial risk of serious harm.  Thus, all claims against the individual Bedford Heights Officers fail as a matter of law and should be dismissed.

1. **Officers Ellis and Chow did not observe a sufficiently serious medical need or consciously disregard a substantial risk of serious harm.**

Officers Ellis and Chow had limited knowledge and involvement with Bey's detention. Officer Ellis, while assisting with Bey's arrest, was informed by Plaintiff that Bey had not been taking medication for a psychiatric issue.  Officer Ellis, however, did not observe any strange behavior or conduct by Bey that would indicate a serious medical need.  To the contrary, Bey was

compliant with Officer Ellis at the time of the stop and arrest.  Accordingly, there was nothing observed by Officer Ellis that would have indicated to a layman that Bey was suffering from a serious medical issue or evidence demonstrating that Officer Ellis disregarded a substantial risk of serious harm.  (M. Ellis Depo., Ex. H, at p. 51-52.)  Therefore, a sufficiently serious medical need was not present and Officer Ellis did not consciously disregard a substantial risk of serious harm.

Likewise, Officer Chow did not observe Bey acting in a manner that would indicate he was suffering from a serious medical issue.  Officer Chow heard Bey talking disjointedly, making crude comments, and asking for his cell phone with a million dollar plan.  These comments, however, only indicated to Officer Chow that Bey was agitated due to his arrest, a delayed response to his request to use the restroom, and lack of privacy while using the restroom.  There is no evidence that Bey was suffering from a serious medical issue based upon Officer Chow's limited observations.  (P. Chow Depo., Ex. M, at pp.43-45.)  In addition, there is no evidence that Officer Chow knew of and disregarded a substantial risk of serious harm.  Accordingly, Officer Chow did not consciously disregard a substantial risk of serious harm.

> **2.**    **Officer Honsaker did not observe a sufficiently serious medical need and did not consciously disregard a substantial risk of serious harm.**

The knowledge and facts known to Officer Honsaker do not demonstrate that he observed a sufficiently serious medical need or acted with criminal recklessness by consciously disregarding a substantial risk of serious harm to Bey.  At the outset, Officer Honsaker noted that Bey was initially attempting to avoid detection by changing clothes as he left Lowe's.  Moreover, when pulled over, Bey attempted to avoid incriminating himself by disingenuously telling Officer Honsaker that it was someone else that caused the disturbance and damaged property at Lowe's. Bey specifically described another individual wearing the same clothing that he had removed prior to leaving the scene.  Bey's calculated and disingenuous attempts to avoid apprehension following

16

the incident at Lowe's fails to show that he was suffering from a medical issue which required emergency medical attention.  To the contrary, Bey's statements establish that he was mentally stable, cognizant of his wrongdoing, and acting in a calculated manner to avoid incriminating himself as is often encountered by an arresting police officer.  (T. Honsaker Depo., Ex. G, at 26.)

Officer Honsaker also observed Officer Ellis take miscellaneous pills from Bey's pockets. Officer Honsaker had no knowledge of what the pills were for and had no way of verifying a prescription for the pills.  Rather, Officer Honsaker appropriately stated it is the responsibility of medical officials at the jail to verify medications and prescriptions.  Officer Honsaker observed Bey rambling and talking about various topics while in the cruiser.  Bey told Officer Honsaker that he takes medications for a psychiatric condition.  Despite this information, Officer Honsaker did not observe conduct or infer that Bey was suffering from a serious medical need that would require immediate medical care.  Rather, Officer Honsaker testified that arrestees often ramble and discuss miscellaneous subjects as they are nervous and anxious due to their arrest.  (Id. at p. 49-50.) Moreover, Bey did not present a threat to himself or others.  (Id.)

Officer Honsaker further stated that Bey claimed he was upset because Plaintiff was in the parking lot.  After Officer Honsaker had Plaintiff leave the area, Bey became less agitated.  Officer Honsaker also observed Bey in the jail when he escorted him to the bathroom. Although Bey made crude statements while using the bathroom, this was not unusual based upon Officer Honsaker's prior interactions with detainees.  And Bey's agitation was reasonably explained by a delay in being able to use the bathroom and a lack of privacy.  Notably, after using the restroom, Bey was polite and thanked Officer Honsaker.  Again, these observations did not indicate that Bey was suffering from a serious medical need that required emergency medical assistance, and there is no evidence that Officer Honsaker consciously disregarded a substantial risk of serious harm.

17

### 3.   Officers Lee and Hill did not observe a sufficiently serious medical need and did not consciously disregard a substantial risk of serious harm.

Nothing was observed by Officers Lee and Hill that would cause a layman to believe that Bey was suffering from a mental health emergency requiring immediate care.  When Bey initially arrived at the jail, Officers Lee and Hill placed Bey in a holding cell to allow him to calm down prior to the booking process.  Bey at that time was agitated with Officer Honsaker due to his recent arrest.  Officer Honsaker informed Officer Hill that Bey had been rambling in the back of the cruiser.

Officer Hill, however, did not witness any behavioral problems on the part of Bey during her shift that would have indicated a need for emergency medical assistance.  Officer Hill saw Bey sitting and talking to himself.  Officer Hill also heard Bey kicking on the holding cell door, but this was not unusual behavior for a detainee. According to Officer Hill, at the end of her shift, she informed Officer Mudra that Bey seemed agitated.  However, Bey's agitation did not demonstrate he was suffering from a serious medical emergency.

Like Officer Hill, Officer Lee did not observe any behavior by Bey that would indicate he was suffering from a mental health emergency that needed immediate care. Officer Lee did not observe Bey rambling or kicking his door.  According to Officer Lee, Bey was not combative or out of control at the time he was placed in the holding cell and the reason they decided not to book Bey was based on statements made by Officer Honsaker.

Both Officers Hill and Lee testified that their observations of Bey did not indicate to them that he was suffering from a mental health emergency.  The actions of Bey while in the holding cell at the jail were not out of the ordinary to either Officer Hill or Officer Lee.  In short, it was not unusual for a prisoner to be agitated and rambling due to the stress caused by detainment at the jail.  (C. Hill Depo., Ex. I, 39; 53-54; C. Lee Depo., Ex. J, at pp. 51-52.)  There is no evidence that

18

Bey's agitation represented a serious medical need or that he presented a danger to himself or others.  Accordingly, neither Officer Hill nor Officer Lee observed any signs of a serious mental health emergency that required immediate medical care and did not act with criminal recklessness by consciously disregarding a substantial risk of serious harm.

### 4. Assistant Chief Leonardi did not observe a sufficiently serious medical need prior to the assault and did not consciously disregard a substantial risk of serious harm.

Assistant Chief Leonardi's interactions with Bey prior to the assault were limited to hearing him kick the cell door because he needed to use the restroom and escorting Bey to the restroom with Officer Honsaker.  Assistant Chief Leonardi testified that it is normal for an inmate to kick or bang on a cell door when they want something and often detainees make crude statements with respect to arresting police officers.  Bey's agitation could also be reasonably attributed to having to wait to use the bathroom and a lack of privacy.  Accordingly, the limited interactions Assistant Chief Leonardi had with Bey prior to the assault did not indicate that Bey was suffering from a mental health emergency that required immediate medical attention.  (D. Leonardi Depo., Ex. A, at pp. 77; 139.)  Furthermore, Assistant Chief Leonardi did not act with criminal recklessness by consciously disregarding a substantial risk of serious harm.

### 5. Officers Mudra and Sindone did not observe a sufficiently serious medical need and did not consciously disregard a substantial risk of serious harm.

Officers Mudra and Sindone observed Bey rambling and singing in the holding cell. Officer Sindone also observed Bey using his hands to eat his food.  Both Officers testified that this type of behavior is not unusual for detainees and it did not indicate to them that Bey was suffering from a mental health emergency.  Moreover, just prior to his booking, during the booking process, and following his booking, Bey was calm and compliant.  During the booking process, Bey

19

informed Officer Mudra that he had not seen a doctor for psychiatric issues and was not taking any psychiatric medications.  Indeed, Bey was compliant when removed from his cell to use the phone, just prior to the sudden and unforeseeable assault.  Accordingly, neither Officer Mudra nor Officer Sindone observed a sufficiently serious medical need and did not consciously disregard a substantial risk of harm. (C. Sindone Depo., Ex.  K, at 41; 44-46; J. Mudra Depo., Ex. L, at 28.)

### 6.  Conclusion for individual Bedford Heights Officers.

In conclusion, the facts known to each individual Bedford Heights Officer fails to establish that Bey was suffering from a serious mental health emergency that would have been easily observable to a layman.  Moreover, there is no evidence that the individual Bedford Heights Officers acted with criminal recklessness by consciously disregarding a substantial risk of harm.

These conclusions are supported by cases in which federal courts have found no constitutional violation despite evidence of detainees/inmates exhibiting severe psychosis with multiple instances of physically combative altercations – neither of which are present in this case. *Mann v. Taser Intern., Inc.*, 588 F.3d 1291. (11th Cir., 2009) (no constitutional violation despite deputies observations of the detainee slamming her head against the trunk of a car and flailing her body in an attempt to hit, kick, head butt and spit on the deputies); *Woodward v. City of Gallitin, Tenn.*, not reported, 2013 WL 6092224 (M.D.Tenn, 2013) (no deliberate indifference despite detainee's statements which demonstrated he was out of touch with reality and his aggressive combative actions); *Slone v. Judd*, not reported, 2011 WL 1124618 (M.D.Fla., 2011) (no constitutional violation despite knowledge that the detainee was bipolar, had made verbal threats such as telling officers they would have to "go through God" to take him out of his cell; was wrapping blankets around his face; was talking incoherently; was sweating profusely; and engaged in multiple physical altercations.)  *Estate of Harvey v. Roanoke City Sheriff's Office*, 585

F.Supp.2d 844, (W.D.Vir., 2008). (no deliberate indifference despite the detainee's delusional comments; throwing feces at deputies while they tried to serve him breakfast; and multiple violent altercations with deputies).

Thus, there has been no violation of the Fourteenth Amendment and the §1983 claims should be dismissed.  Moreover, Bey's unforeseeable assault destroys and potential proximate cause and, for this additional reason, the §1983 claims should be dismissed.

### C.    The individual Bedford Heights Officers are entitled to Qualified Immunity on the §1983 claims.

Plaintiff must overcome the defense of qualified immunity, which shields government officials from liability for civil damages.  "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  Once a defendant has submitted evidence to show that he or she was acting within the scope of his or her discretionary authority, the plaintiff has the burden of proving that the defendant is not entitled to qualified immunity. *Wegvener v. Covington*, 933 F. 2d 390, 392 (6th Cir., 1991).

The plaintiff can only defeat the qualified immunity defense by establishing that a reasonable official in the defendant's position should have known that his or her conduct violated a right arising under or protected by the United States Constitution or laws.  *Pray v. Sandusky*, 49 F.3d 1154, 1157 (6th Cir., 1995).  Accordingly, to overcome qualified immunity, the plaintiff must show that a constitutional right has been violated and that case law clearly establishes that a reasonable official in the defendant's position should have known that such conduct would violate the constitutional right.  *Id*.  The issue of whether or not a right is clearly established is a question of law, not fact.  *Monday v. Oullette,* 118 F.3d 1099 (6th Cir., 1997); *Garvie v. Jackson,* 845 F.2d

647 (6th Cir., 1988).  Whether an official's conduct is objectively reasonable is considered in light of the law clearly established at the time of the conduct and in light of the information possessed by the officials.  *Anderson v. Creighton,* 483 U.S. 635 (1987).

The above has already shown that the Fourteenth Amendment has not been violated by any of the individual Bedford Heights Officers.  For this reason alone, the individual Bedford Heights Defendants are entitled to qualified immunity and the §1983 individual capacity claims must be dismissed.

Moreover, based upon the applicable case law and legal standards no reasonable official under similar circumstances to that of the individual Bedford Heights Officers would know that their observations or actions could result in a violation of the Fourteenth Amendment.  Case law does not establish "beyond debate" that a reasonable officer in the position of the Bedford Heights Officers should have known that Plaintiff was suffering from a serious mental health emergency which could result in cardiac arrest.  To the contrary, case law considering the conduct of much more aggressive and combative detainees fails to establish that the defendant officers deliberately disregarded the potential for a psychiatric break which could lead to an assault and cardiac arrest. *Mann*, supra, 588 F.3d 1291; *Woodward*, supra; *Slone*, supra; *Estate of Harvey*, supra.

Here, the evidence demonstrates that Bey at times was rambling about various strange topics, was agitated when he first entered the jail, made crude statements to male Officers while using the bathroom, kicked his cell door, and used his hands to eat.  The Bedford Heights Officers noted these behaviors were not unusual and did not suggest to them that Bey was suffering from a serious medical need.  Notably, Bey's behavior became subdued after a period of time in the holding cell.  By approximately 3:30 p.m., Bey was calm and compliant during his booking process.  During the booking process Bey denied that he was suffering from a psychiatric problem

and that he was taking psychiatric medications.  When asked if he would like to use the phone at around 6:00 p.m., Bey replied yes and was again compliant while walking to the phone.  Bey's sudden and unforeseeable attack of Officer Mudra occurred while walking back to his holding cell from the phone.  At no time prior to the sudden assault did Bey exhibit any behavior that would have displayed a potential for harm to himself or others.

Based upon the aforementioned case law, the individual Bedford Heights Officers' observations of Bey would not have placed a reasonable official on notice that they were in violation of the Fourteenth Amendment.   For these additional reasons, the Bedford Heights Officers are entitled to qualified immunity and the claims against them should be dismissed.

### D. The *Monell*/official capacity claims against the City of Bedford Heights fail as a matter of law.

The Amended Complaint also attempts to assert §1983 claims against the City of Bedford Heights as well as the Bedford Heights Officers in their official capacities for an alleged constitutional violation.  The claim against Bedford Heights and the official capacity claims are considered *Monell* claims against a local government and will be addressed accordingly.  *Monell v. Dept. of Social Serv.*, 436 U.S. 658 (1978).  For a local government to be held liable under *Monell*, a plaintiff must show that the government itself caused the constitutional violation at issue.  *Canton* v. *Harris*, 48 U.S. 378 (1989).  This requires that the plaintiff allege and prove a local government's policy, custom, or procedure was the moving force behind the alleged constitutional deprivation.  *Monell*, supra.  Thus, the plaintiff must show that the governmental action was taken with the requisite degree of culpability and demonstrate a direct causal link between the government action and the deprivation of federal rights.  *Bd. of Cty. Commrs. of Bryan Cty. v. Brown*, 522 U.S. 397, 403-404 (1997).   Indeed, local government liability for the actions of

employees may not be based on a theory of respondeat superior. *Berry v. City of Detroit*, 25 F.3d 1342, 1345, (6th Cir., 1994).

In *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986), the United States Supreme Court held that if an individual government official "inflicted no constitutional injury on [the plaintiff], it is inconceivable that [a local government] could be liable" for a §1983 *Monell* claim. Likewise, the Sixth Circuit Court of Appeals has held that, per *Heller*, a summary judgment determination that a government official has not violated a plaintiff's constitutional rights bars a §1983 *Monell* claim against a local government. *Peet v. Detroit*, 502 F.3d 557, 566 (6th Cir., 2007).

As noted above, the individual Bedford Heights Defendants committed no Constitutional violation. Thus, per *Heller* and *Peet*, Plaintiff's §1983 *Monell* claims fail as a matter of law and must be dismissed.

Moreover, the *Monell* claims fail because Plaintiff has failed to establish that a Bedford Heights jail policy, custom, or practice directly resulted in the alleged constitutional violations. A *Monell* claim limits municipal liability to a constitutional violation arising from an "official policy" of the municipality. *Young v. Mahoning Cty.* (N.D.Ohio, 2005), 418 F.Supp.2d 948. As a result, a plaintiff attempting to establish *Monell* liability must demonstrate at least one of three categories of "official policy": (1) an express policy or custom of the municipality; (2) a final policymaker's conduct; or (3) the municipality's failure to train employees. *Young* at 956.

Notably, a correctional officer's mere authority to exercise discretion while performing the particular functions of his or her job does not make the officer a final policy maker – unless such decisions are final and unreviewable and are not constrained by the official policies of superior officials. *Feliciano v. Cleveland*, 988 F. 2d 649, 655 (6th Cir., 1993), citing *St. Louis v. Praprotink*, 485 US 112, 127 (1988). See, also, *Waters v. Morristown*, 242 F. 3d 353, 361 (6th Cir., 2001).

24

"Discretion to act is not to be confused with policymaking authority; no [local government] liability results where an official merely has discretion to act because subjecting a [local government] to liability in such a situation would be 'indistinguishable' from respondeat superior liability." *Feliciano* at 656, quoting *Praprotink* at 126.

In order to succeed on a *Monell* claim for an alleged failure to train, supervise, or discipline Plaintiff must show that Bedford Heights was "deliberately indifferent" to inadequate training, supervision, or discipline.  *Bd. of Cty Comm'rs of Bryan Cty.* at 397-398; *Canton v. Harris*, 489 U.S. 378; 388-390 (1989).  To show deliberate indifference, Plaintiff must establish that the need for more or different training, supervision, or discipline was obvious and that the training supervision, or discipline in place was so inadequate that it would inevitably result in the claimed violation of constitutional rights.  *Canton* at 388-390; *Berry* at 1354.

Furthermore, to prevail on a failure to train, supervise, or discipline claim, the plaintiff must also show that the alleged inadequacy actually caused the proposed injury.  *City of Canton,* 489 U.S. at 390.  In short, the plaintiff must establish that the alleged failure to train, supervise, or discipline was the direct proximate cause of the claimed injury.  *Estate of Sowards v. Trenton*, 125 Fed.Appx. 31 (6th Cir., 2005).

The evidence affirmatively shows that at the time of and prior to the incident written policies regarding offender intake, inmate healthcare, and the handling of inmate pharmaceuticals were in place. These policies adequately address the conduct of correctional officers when confronted with an inmate that has an observable or known medical issue or complaint. Accordingly, the policies in effect at the time of the incident cannot be considered a moving force behind the alleged constitutional violation and Plaintiff has failed to establish a *Monell* claim.  For this additional reason, Plaintiff's *Monell* claims should be dismissed.

Further, there is no evidence of deliberate indifference as to training.  A Bedford Heights Jail nurse provided annual training and testing for Correctional Officers relating to medical emergencies, passing medications, infection control, and suicide prevention.  The suicide prevention training included training relating to mental health issues.   The training included a formal curriculum with written and video materials.  Once the nurse completed the training, Correctional Officers were tested via a written exam on the curriculum.

Based upon the aforementioned, it is clear that prior to and at the time of Bey's detention at the jail, Bedford Heights took numerous affirmative actions to ensure that the jail policies and procedures effectively addressed and protected inmate health.  There is no evidence establishing that Bedford Heights adhered to a policy, practice, or custom of inadequate training or supervision of Officers that they knew or should have known would fail to prevent unconstitutional conduct. *Bd. of Cty. Comm'rs of Bryan Cty* at 407.   Accordingly, the *Monell* claims fail and must be dismissed.

> **E.     As to the state law claims, the Bedford Heights Defendants are entitled to immunity under R.C. Chapter 2744.**

Plaintiff attempts to assert state law claims for willful, wanton, reckless, and/or negligent conduct, as well as a wrongful death and survivorship actions.  As will be established below, all Bedford Heights Defendants are entitled to R.C. Chapter 2744 immunity as to the state law claims.  Therefore, the state law claims should be dismissed.

> **1.     The City of Bedford Heights is entitled to R.C. Chapter 2744 immunity.**

Chapter 2744 of the Ohio Revised Code, the Political Subdivision Tort Liability Act, provides a general grant of immunity to political subdivisions in actions seeking damages for injuries, death or loss to persons or property.  *Theobald v. Board of Cty. Com'rs of Hamilton Cty.*, 332 F.3d 414, 416 (6th Cir., 2003).  The issue of whether a city is entitled to immunity under the

26

Act is an issue of law that is particularly apt for resolution by summary judgment. *Trader v. Cleveland*, 8th Dist. No. 86227, 2006-Ohio-295, at ¶10.

The Ohio Supreme Court has established a three-tiered analysis to determine whether a political subdivision is immune from tort liability. *Colbert v. Cleveland* (2003), 99 Ohio St. 3d 215; *Bush v Cleveland Municipal School District*, 8th Dist. No. 99612, 2013-Ohio-5420. The first tier is to establish whether the general grant of immunity under R.C. 2744.02(A)(1) applies by determining if the case involves a political subdivision performing a governmental or proprietary function. *Id*. The second tier requires the court to determine whether any of the exceptions to immunity listed under R.C. 2744.02(B) apply. *Colbert*, supra. If none of the exceptions apply the analysis ends as the political subdivision is entitled to immunity. *Maddox v. E. Cleveland*, 8th Dist. No. 92673, 2009-Ohio- 6308, at ¶13. If one of the immunity exceptions applies then, under the third tier, the political subdivision can establish one of the defenses listed in R.C. 2744.03 to reinstate immunity. Application of the three-tier analysis to the instant matter clearly establishes that Bedford Heights is entitled to immunity on all claims.

As a municipal corporation, Bedford Heights is unquestionably a political subdivision subject to the provisions of R.C. Chapter 2744. R.C. 2744.01(F). Moreover, as will be described in more detail below, Bedford Heights was engaged in law enforcement activities and the operation of a jail, both of which are clearly governmental functions. R.C. 2744.01(C)(2)(a)(b)(i) and (h). Accordingly, the first tier of the analysis has been satisfied and Bedford Heights is entitled to the general grant of immunity provided by R.C. 2744.02(A)(1). *Franks v. Lopez* (1994), 69 Ohio St.3d 345, 347.

Under the second tier of the analysis, a political subdivision's blanket immunity under R.C. 2744.02(A)(1) is subject to five very limited exceptions listed at R.C. 2744.02(B). *Howard v.*

27

*Miami Twp. Fire Div.*, 119 Ohio St. 3d. 1, 2008-Ohio-2792.  Once immunity is asserted, the

plaintiff has the burden of establishing that one of the immunity exceptions applies.  *Sims v.*

*Cleveland*, 8th Dist. No. 92680, 2009-Ohio-4722.  These five immunity exceptions are to be

narrowly construed.  *Doe v. Dayton City School Dist. Bd. of Educ.* (1999)*,* 137 Ohio App.3d 166,

169.

The immunity exceptions set forth under R.C. 2744.02(B) relate to the following:

- Injuries caused by the negligent operation of a motor vehicle or willful or wanton operation of a vehicle by  police or other emergency services workers  responding to an emergency call [R.C. 2744.02(B)(1)(a)];

- The negligent performance of acts by political subdivision employees with respect to proprietary functions [R.C. 2744.02(B)(2)];

- The political subdivision's negligent failure to keep public roads in repair and other negligent failure to remove obstructions from public roads [R.C. 2744.02(B)(3)];

- The negligence of political subdivision employees which cause an injury that due to physical defects within or on the grounds of buildings that are used in the performance of a governmental function [R.C. 2744.02(B)(4)]; and

- When liability is expressly imposed upon the political subdivision by a section of the Revised Code [R.C. 2744.02(B)(5)].

None of the exceptions apply in the instant case.  This case clearly does not involve the

operation of a motor vehicle, failure to keep roads in repair, or physical defects in a building used

for a governmental function.   Furthermore, the provision of law enforcement services, the

enforcement of any law, and the operation of a jail are expressly defined as governmental functions

and  thereby  excluded  by  definition  from  the  term  "proprietary"  function.    R.C.

2744.01(C)(2)(a)(b)(i) and (h); *Frazier v. City of Kent*, 9th Dist. No. 2004-P-0077, 2005-Ohio-

5413 (holding that "proprietary functions" and "governmental functions" are mutually exclusive

concepts.)  Finally, Plaintiff has not cited to any statute and there appear to be no statutes expressly

imposing civil liability in relation to the claims.

28

Since no exception to immunity applies, it is clear that Bedford Heights is immune under R.C. Chapter 2744 from the state law claims asserted by Plaintiff.  Accordingly, these claims should be dismissed as a matter of law.[3]

### 2. The individual Bedford Heights Officers are entitled to R.C. Chapter 2744 immunity.

As employees of a political subdivision, the Bedford Heights Officers are entitled to immunity under R.C. 2744.03(A)(6) with certain limited exceptions.  *Mayes v. Columbus* (1995), 105 Ohio App.3d 728 .  Specifically, R.C. 2744.03(A)(6) provides in relevant part:

> "In a civil action brought against ... an employee of a political subdivision to recover damages for injury, death, or loss to persons or property allegedly caused by any act or omission in connection with a governmental or proprietary function, ... **the employee is immune from liability unless one of the following applies**:
>
> "(a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
>
> "(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;
>
> "(c) Liability is expressly imposed upon the employee by a section of the Revised Code."  (Emphasis added.)

By its terms, R.C. 2744.03(A)(6) operates as a presumption of immunity.  *Cook v. Cincinnati*, 103 Ohio App.3d 80, 90 (1995).  As with the subdivision itself, this presumption may only be overcome by demonstrating that an exception to immunity applies.  *M.B. v. Elyria City Bd. of Educ.*, 9th App. Dist., 05CA008831, 2006-Ohio-4533.

None of the exceptions apply in this case. The Second Amended Complaint concedes that the Bedford Heights Officers were acting within the scope of their employment.  (Compl., at ¶¶9-12.).  Plaintiff has not cited and the Bedford Heights Defendants are not aware of any provisions

---

3. An analysis of the third tier of the sovereign immunity analysis is unnecessary if it is determined that none of the exceptions to sovereign immunity can be established.  *Harris v. Sutton*, 183 Ohio App.3d 616, 622, 2009-Ohio-4033. As none of the exceptions to immunity apply, there is no need for this Court to analyze whether immunity could be reinstated pursuant to the defense provided in R.C. 2744.03.

of the Revised Code that expressly impose civil liability on the Officers under the circumstances of this case. Therefore, the employee immunity exceptions under R.C. 2744.03(A)(6)(a) and (c) are inapplicable.

The exception under R.C. 2744.03(A)(6)(b) is also inapplicable.  There is no evidence that any of the individually named Bedford Heights Officers acted willfully, wantonly, or recklessly. The Ohio Supreme Court defined the terms "willful," "wanton" and "reckless" in *Anderson v. Massillion*, 134 Ohio St. 3d. 380, 2012-Ohio-5711.

First, "willful misconduct implies an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposefully doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury."  *Id*. ¶32.

"Wanton misconduct" is the failure to exercise any care toward those to whom a duty of care is owed in circumstances where there is a probability that harm will result."  *Id*. ¶33.

"Reckless conduct" is characterized by a conscious disregard or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct.  *Id*. ¶34.

Both reckless and wanton misconduct require that the actor must be conscious that his or her conduct will in all probability result in injury.  *Id*. at ¶¶33-34.  See, also, *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, at syllabus paragraph 3.[4]

At the outset, as described above, there is no evidence that any Bedford Heights Defendant intentionally deviated from a known duty with the purpose or appreciation that such deviation

---

4.  The state law claims of negligence against the individual Bedford Heights Officers must be dismissed as mere negligence does not satisfy the level of mental culpability necessary to demonstrate willful, wanton, or reckless misconduct.

would injure Bey.  Accordingly, there is no evidence that the individual Bedford Heights Defendants acted with willful misconduct.

Likewise, there is no evidence that the Bedford Heights Officers acted with the requisite level of mental culpability to demonstrate reckless or wanton misconduct.  As shown under the §1983 analysis, the individual Officers did not make any observations or draw any inferences from Bey's behavior that he was suffering from a serious medical emergency and there is no evidence they consciously disregarded a substantial risk of harm.  Although Bey's behavior would be considered strange in a non-jail setting, his behavior was not unusual in the jail as detainees often exhibit these behaviors due to the stress and anxiety of being arrested and placed in jail.  The Officers took appropriate precautions by placing Bey in a holding cell and delaying his booking to allow him to calm down.  They provided him with supervision and food.  After a period of time, Bey became calm and was then processed and booked.  He was compliant throughout the booking process and answered "no" to questions regarding whether he was suffering from a psychiatric condition or taking psychiatric medications. Bey remained calm and compliant following his booking until he suddenly assaulted Officer Mudra.  At no time prior to the assault did Bey pose a danger to himself or others.

The evidence simply fails to demonstrate that the Bedford Heights Officers had knowledge that Bey would without warning assault Officer Mudra.  There is also nothing demonstrating that the Officers consciously disregarded a known substantial risk of harm to Bey.  To the contrary, the Officers provided Bey with appropriate supervision and allowed him to calm down from his initial agitated state.  Accordingly, the Bedford Heights Officers did not act in a reckless or wanton manner.

Based upon the foregoing, the Officers did not act willfully, recklessly or wantonly.  As a result, the exception under R.C. 2744.03(A)(6)(b) is also not applicable and the Officers are entitled to immunity.  Therefore, the state law claims against the Bedford Heights Officers should also be dismissed.

### F.    The state law claims fail on the merits.

In addition to immunity, the Bedford Heights Defendants are entitled to summary judgment on the state law claims because the claims fail on the merits.  Plaintiff's state law claims require that she establish the following elements:  1) the existence of a duty owing to Bey; 2) breach of that duty, 4) proximate causation between breach of duty and the injuries in this case.  R.C. §§ 2125.01 and 2305.21.  See, also, *Pylypiv v. Parma*, 8th Dist. No. 85995, 2005-Ohio-6364, at ¶31.  Plaintiff's state law claims fail to establish the duty and proximate cause elements.

Under Ohio law, the existence of a duty depends on the foreseeability of the injury.  *Menifee v. Ohio Welding Products, Inc.* (1984), 15 Ohio St.3d 75, 77.  As demonstrated above, the Bedford Heights Defendants provided appropriate supervision and care for Bey and his sudden assault and cardiac arrest were not foreseeable.  As a result, the Bedford Heights Defendants did not breach any duty owed to Bey and the state law claims fail on the merits.

Plaintiff also fails to establish that the Bedford Heights Defendants caused Bey's death.  In determining whether a defendant party may be held liable for a plaintiff's injuries, courts must examine two aspects of causation:  actual causation and proximate cause.  *Sibley v. Zimmerman*, 4th Dist. No. 97 CA 51, 1998 WL 548755, at 9.  The standard test for establishing actual causation is the *sine qua non* or "but for" test.  *Anderson v. St. Francis-St. George Hosp. Inc.* (1996), 77 Ohio St.3d 82, 84-85.  Under this test, a defendant's conduct is a cause of the event or harm if the event or harm would not have occurred but for that conduct.   *Id.*

32

There is no evidence that the conduct of the Bedford Heights Officers was the "but for" cause of Bey's death.  In short, there is no evidence that anything done by the Bedford Heights Defendants caused Bey's sudden assault.  Likewise, there is nothing indicating that the Bedford Heights Defendants were the "but for" cause of his sudden cardiac arrest.  Specifically, it is noted that contributing factors to the cardiac arrest were Bey's weight and his heart anatomy. The Bedford Heights Defendants simply were not the "but for" cause of Bey's death.

Likewise, Plaintiff has failed to set forth facts that demonstrate proximate cause.  It is well established that in order for a person to recover in damages, the act complained of must be a direct and proximate cause of the injury.  *Strother v. Hutchison* (1981), 67 Ohio St.2d 282, 287.  A defendant in an action for negligence can be held to respond in damages only for the immediate and proximate result of the negligent act alleged.  *Id*.  Proximate cause requires that the injury sustained shall be the natural and probable consequence of the negligence alleged.  *Id*.  That is, the consequences of the alleged negligent act under the specific surrounding circumstances could and should have been foreseen or anticipated by the wrongdoer as likely to follow his negligent act. *Id.*

When, between the negligence and the occurrence of an injury, there intervenes an unforeseeable act of a third person or by the individual injured which causes the injury but was not intended by the allegedly negligent person and could not have been foreseen by them, the causal chain between the negligence and the accident is broken.  *Bilicic v. Brake* (1989), 64 Ohio App.3d 304, 307.  In such cases, the alleged negligence would be only the remote or removed cause and not the proximate cause giving rise to liability.  *Id.* See, also, *Burr*, supra.

Here, there is nothing indicating that any act or omission by a Bedford Heights Officer resulted in the sudden assault or cardiac arrest.  Again, Bey was calm and compliant during his

booking process and while he walked to the jail phone.  Officer Mudra did not take any action or make any statement to Bey that would have triggered his sudden assault.  The sudden assault by Bey was an unforeseeable event that breaks the causal chain, thereby precluding proximate cause.

Moreover, once the assault occurred the Bedford Heights Officers acted promptly and appropriately in removing Bey from Officers Mudra and Sindone.  Just moments after Bey was placed in the restraint chair a Bedford Heights Officer checked his pulse and found it was weak.  Assistant Chief Leonardi immediately had Bey removed from the chair and called for emergency medical responders.  Bey was given immediate medical attention and taken to the hospital.  There is no evidence demonstrating that the Bedford Heights Officers actions in response to the intervening unforeseeable assault represented negligence that was the proximate cause of Bey's death.  Accordingly, for this additional reason Plaintiff cannot establish causation and the state law claims fail on the merit.

**G.     Punitive damages cannot be assessed against the City of Bedford Heights due to its status as a political subdivision and pursuant to R.C. 2744.05(A).**

To the extent Plaintiff's federal and state law claims seek punitive damages from the City of Bedford Heights, such claims fail as a matter of law.  The United States Supreme Court has held that punitive damages are not available from a municipality under §1983/Monell claims.  *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981); *Kentucky v. Graham*, 473 U.S. 159 (1985).

Plaintiff is also barred from recovering punitive damages from Bedford Heights on Plaintiff's state law claims.  Section 2744.05(A) of the Ohio Revised Code clearly states that "punitive or exemplary damages shall not be awarded" in an action against a political subdivision.  *Thompson v. Germantown Cemetery*, 188 Ohio App. 3d 132, 2010-Ohio-1920.  Moreover, the Ohio Supreme Court has also held that the award of punitive damages against a municipality is

against public policy and not permitted.  *Ranells v. City of Cleveland* (1975), 41 Ohio St. 2d 1, 6-7; *Spires v. City of Lancaster* (1986), 28 Ohio St. 3d 76, 79.

Punitive damages assessed against Bedford Heights is clearly prohibited under federal and state law.  As a result, to the extent Plaintiff seeks punitive damages against Bedford Heights, such claim should be dismissed as a matter of law.

**CONCLUSION**

Based upon the foregoing, Plaintiff's federal and state law claims against the Bedford Heights Defendants fail as a matter of law.  Therefore, summary judgment is appropriate and all claims stated against the Bedford Heights Defendants should be dismissed.

Respectfully submitted,

MAZANEC, RASKIN & RYDER CO., L.P.A.

*s/John D. Pinzone*
JAMES A. CLIMER (0001532)
JOHN D. PINZONE (0075279)
100 Franklin's Row
34305 Solon Road
Cleveland, OH  44139
(440) 248-7906
(440) 248-8861 – Fax
Email:    jclimer@mrrlaw.com
             jpinzone@mrrlaw.com

*Counsel for Defendants City of Bedford Heights,*
*Officer Tim Honsaker, Officer Maurice Ellis,*
*Officer Phillip Chow, David Leonardi, Jeffrey*
*Mudra, Cheryl Sindone, Cynthia Lee and Carolyn*
*Hill*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 25, 2015, a copy of the foregoing Defendants' Motion

for Summary Judgment was filed electronically.  Notice of this filing will be sent to all registered

parties by operation of the Court's electronic filing system.  Parties may access this filing through

the Court's system.

*s/John D. Pinzone*
JAMES A. CLIMER (0001532)
JOHN D. PINZONE (0075279)

Counsel for Defendants City of Bedford Heights,
Officer Tim Honsaker, Officer Maurice Ellis,
Officer Phillip Chow, David Leonardi, Jeffrey
Mudra, Cheryl Sindone, Cynthia Lee and Carolyn
Hill

NORMA-130139/MSJ of Defendants