IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

ANITA ARRINGTON-BEY, etc., )
                           )
          Plaintiffs,      )
                           )
     v.                    ) Case No. 1:14-CV-02514
                           ) Judge Patricia A. Gaughan
THE CITY OF BEDFORD HEIGHTS,)
et al.,                    )
                           )
          Defendants.      )

- - -

THE DEPOSITION OF ASSISTANT CHIEF DAVID LEONARDI

WEDNESDAY, MARCH 11, 2015

- - -

The deposition of ASSISTANT CHIEF DAVID LEONARDI, a Defendant herein, called for examination by the Plaintiffs, under the Federal Rules of Civil Procedure, taken before me, Kristine M. Esber, a Notary Public in and for the State of Ohio, pursuant to notice, at the offices of Friedman & Gilbert, 55 Public Square, Suite 1055, Cleveland, Ohio, commencing at 1:30 p.m., the day and date above set forth.

- - -

HOFFMASTER & BARBERIC, INC.
THE GRAY'S BLOCK, SUITE 440
1360 WEST NINTH STREET
CLEVELAND, OH  44113
(216) 621-2550
FAX (216) 621-3377
1-888-595-1970

EXHIBIT A

```
 1   Q.      Do you know the name of the department, the
 2   actual name of it that he is an inspector for?
 3           Is it the Bureau of Adult Detention?
 4   A.      Detention, yes.
 5   Q.      When is the last time you saw him?
 6   A.      I want to say November of 2014 he was in to go
 7   over the new policies that the state's instituting.
 8   Q.      Okay.  And do you have a copy of those policies?
 9   A.      I believe I have them.  They're on the web.
10   Q.      Based on what you remember what were the changes
11   -- what were the significant changes?
12   A.      There was more -- there was -- the question at
13   the time which didn't go about was were the facilities
14   doing away with a breakfast and just feeding them a
15   lunch and a dinner.  That never came to fruition.
16           The final plan, I don't believe it's been put
17   out yet.  I'm not really sure.  There was a meeting
18   subsequently.  I never had that meeting with him
19   because he never came back.
20           So we went over the training of officers.  They
21   wanted the officers to get less training than they did
22   prior to.
23           It was just there were little -- what they
24   wanted to do is standardize it, to cut it down from all
25   that we had.  Space, you know, the amount of space.
```

1  Everything -- they wanted everything to be standardized
2  so if this inspector couldn't make it, they're hiring
3  another inspector and then everybody would look at
4  things on the same page.
5         My facility is a full service facility. So I'm
6  held to different standards than a minimum or a twelve
7  day facility or a five day facility or a three day
8  facility.
9  Q.    Okay. A full service facility would be like the
10 county jail, correct?
11 A.    Correct.
12 Q.    Okay. And more services are obviously involved
13 and required for a full service jail versus a minimum
14 days jail, correct?
15 A.    Correct. It's the amount of time that I can
16 hold them and I have to meet more standards then.
17 Q.    Now, let me ask you this: do you have a file at
18 your office with all of the documents that refer to
19 jail inspections, certificates, accreditation, audits,
20 any of that kind of material; do you have a file there?
21 A.    No. He keeps a file there. He sends me a file.
22 It's about this thick (indicating), a file. I have
23 files from immigration, from him, from -- as far as
24 accreditations, we don't have any accreditations.
25        But yeah, what I get is I receive a slip of

```
 1   Q.      All right.  And the online course is something
 2   that the city pays for?
 3   A.      No.
 4   Q.      Who pays for it?
 5   A.      I would assume the National Institute of
 6   Corrections.  It's a free service.
 7   Q.      Do you have to have a certain code to get into
 8   that?
 9   A.      Each officer has to register with them.
10   Q.      All right.  And how would we get the online
11   course or courses to the extent that we don't have
12   access to it; we couldn't just go online and --
13   A.      I don't know.
14   Q.      All right.  But you have access to it, right?
15   A.      Yes.  I have access to what my personnel do.
16   Just my facility.
17   Q.      All right.  But do you have access to actually
18   the course materials that are online?
19   A.      Yes, where I can look at the catalogue.  Yes.
20   Q.      Just the catalogue, or yes, you get the actual
21   --
22   A.      The catalogue is online.  And they give you a
23   small blurb of what it's going to be prior to taking
24   the course.
25   Q.      All right.  And by the way, how many people were
```

1  in under the jail administration structure?
2  You were the jail administrator, and then who
3  else was working in the jail in terms of positions?
4  A.    There was a transport officer. There was a
5  secretary. And there were part-time correction
6  officers and full-time correction officers.
7  Q.    All right.
8  A.    There's also two nurses on -- part-time nurses
9  on staff and not -- they're part-time nurses and they
10 are paid by the City of Bedford Heights. Then there's
11 a doctor that's an outside entity that comes in.
12 Q.    All right. So in June of 2013 you were the jail
13 administrator. You oversee the whole operation,
14 correct?
15 A.    Correct.
16 Q.    And then there's a transport officer. Was there
17 a transport officer then?
18 A.    Yes.
19 Q.    Who was that?
20 A.    Sam Salk.
21 Q.    S-U-L-K?
22 A.    S-A-L-K.
23 Q.    What was his job?
24 A.    His job is to do court details and to transfer
25 prisoners from our facility to the county or from other

1  related to that particular issue?
2  A.  New training, no.
3  Q.  All right. And do you know if any of the online
4  training that you ordered the COs to take involve the
5  subject matter of mental health or mentally disabled
6  inmates?
7  A.  I'm not sure.
8  Q.  All right. Now, before you took the job,
9  Commander Schultz ran the jail. You said he retired.
10 A.  Correct.
11 Q.  And I mean, do you know if he lives in the
12 Cleveland area?
13 A.  I believe he does.
14 Q.  Okay. So I could ask him what was going on
15 before you came on the job as to the procedures and the
16 training and that kind of thing, right?
17 A.  Correct.
18 Q.  All right. Let's talk about the day of the
19 incident, but before I get to that, you had mentioned
20 that there was a doctor that provided services to the
21 jail for medical issues, correct?
22 A.  Correct.
23 Q.  Do you know who that person is?
24 A.  Dr. Feltoon.
25 Q.  Was he there when you came on board?

1  Q.     You knew it from the radio traffic that --
2  A.     That he was aggressive.
3  Q.     He was aggressive. And did you know he was a
4  former employee?
5  A.     Yes. That was over the radio.
6  Q.     Okay. So he was out of control, right?
7         He was out of control allegedly at Lowe's,
8  correct?
9  A.     Until he made contact with the officers.
10 Correct.
11 Q.     And then he was getting out of control in the
12 cell by kicking, right?
13 A.     That's a normal occurrence.
14 Q.     You don't consider that to be kind of out of
15 control?
16 A.     No. I consider that to be aggressive behavior
17 for an inmate; that's why we have the restraint chair.
18 Q.     Okay. And mother fucking you and all that,
19 that's normal behavior?
20 A.     That's more than normal.
21 Q.     You don't suspect anything is wrong with them
22 and they're just aggressive people, right?
23 A.     That's -- unfortunately.
24 Q.     All right. And you brought the restraint chair
25 over there as some kind of a notice to him that this is

1  Q.      It would usually be locked, wouldn't it?
2  A.      It would unless -- the thought is when they're
3  asking for assistance, that tumbler is usually turning
4  as soon as they look on the camera and see somebody at
5  the door.
6  Q.      I see. Okay. So the door was locked. What did
7  you do then?
8  A.      I heard loud screaming coming from the jail. I
9  heard it as I was running down the hallway and I heard
10 it when I got to the door.
11 Q.      All right. And then what did you do?
12 A.      As I said, tried the door, couldn't get in. I
13 thought in my head, nobody is in central control, they
14 can't let me in.
15 Q.      Did you see anything through the door?
16 A.      Not that door. That door is solid.
17 Q.      All right.
18 A.      There's a secondary door.
19 Q.      And how did you get the first door open?
20 A.      I went back to my office. I ran back to my
21 office. I obtained the master key. Ran back down to
22 the jail, opened the first door. There's glass now on
23 the sides of those doors, and I could see Mr. Bey on
24 top of the two officers.
25 Q.      Okay. I mean in your report it seems like you

1  saw what was going on through the glass door before you
2  went to get the keys, but --
3  A.    No.  There is no glass in the first part of the
4  doors.
5  Q.    And what did you see again?
6  A.    Mr. Bey on top of the officers and screaming
7  still.
8  Q.    Okay.  You couldn't hear what he was saying?
9  A.    He wasn't screaming.  It was a female screaming.
10 Q.    What was she saying?
11 A.    She wasn't.  She was screaming.
12 Q.    And he was on top of both of them?
13 A.    Correct.
14 Q.    All right.  Did you ever see the video of this?
15 A.    Yes.
16 Q.    Okay.  Did you know how that happened?
17 A.    Yes.
18 Q.    How did he get them down?
19 A.    Apparently -- well, the video shows Officer
20 Mudra allowed him to go and use the phone.  He came
21 back around from the phone.  He squared off with
22 Officer Mudra.  He grabbed Officer Mudra, flipped him
23 up and over and onto his back.
24 Q.    All right.  And then the other correctional
25 officer came to intervene?

1  aggressive actions at the jail; would there be a
2  different standard for those kinds of inmates versus
3  inmates who have not shown any kind of aggression or
4  agitation?
5  **A.    The CO, the booking officer, the CO makes that**
6  **decision.**
7  Q.    Okay.  Is there a policy about how to help them
8  make that decision?
9  **A.    No.**
10 Q.    All right.  Okay.  So getting back to the
11 incident.  You heard the screaming, yelling.  You went
12 back to the get the key.  You get into the jail.  What
13 do you see?
14 **A.    I see Mr. Bey on top of Mudra and on top of**
15 **Sindone, straddling them.**
16 Q.    And what did you do?
17 **A.    I'm at a full sprint running toward him.**
18 Q.    How many feet is it away from when you get
19 inside?
20 **A.    Fifteen.**
21 Q.    And what did you do?
22 **A.    He put his hand up.  I went around behind him,**
23 **reached my left hand across his chin, flipped over**
24 **behind him, put his body on top of mine.**
25 Q.    All right.  He was standing?

Page 99

```
 1  A.    No.  He was on the ground.
 2  Q.    Was his whole body over them?
 3  A.    He was straddling them.
 4  Q.    Okay.  What does that mean?
 5  A.    He had his legs straddled across Mudra pinned
 6  down with one hand, and he had Sindone around the neck
 7  by the other hand.  Both officers were incapacitated.
 8  Q.    Okay.  Were both officers on their back or on
 9  their front?
10  A.    Both officers were on their back.
11  Q.    Okay.  And he's straddling Mudra and has his arm
12  where?
13        Was Mudra to the left or to the right?
14        If you're right behind --
15  A.    No.  If I'm in front as I'm approaching them,
16  Mudra is on the ground here (indicating) and Sindone is
17  on the ground right next to --
18  Q.    That doesn't help me because there's a court
19  reporter.
20  A.    Oh.  Then Mudra is to the right.  Sindone is on
21  the left.
22  Q.    All right.  And was Bey on his knees?
23  A.    Bey was on one knee.  His right knee was on the
24  ground straddled over Mudra.  His left knee was in a
25  cocked position as a knee, like I don't know how to --
```

Page 100

1  bent; it was bent still upright.
2  Q.     Now, where was his arms when you first saw him?
3  A.     On both parties.
4  Q.     Okay. Where?
5  A.     On the neck of -- he was holding on the chest
6  area, neck of Mudra, and he had around the chest area,
7  neck of Sindone. When I broke toward him he removed
8  his hand off of Sindone and raised it up toward me.
9  Q.     His left hand?
10 A.     Correct.
11 Q.     All right. And then what did you do?
12 A.     Went and pushed his hand out of the way
13 (indicating). Went around him --
14 Q.     With your left hand.
15 A.     Correct.
16 Q.     Left arm, forearm?
17 A.     Left forearm around his jaw bone line and drug
18 him -- I flipped over and drug him back so his back is
19 against my chest and I have him secure.
20 Q.     So you were on your feet when you did this?
21 A.     I was on my feet until I got to him and then I
22 had to -- I flipped over top of him to get behind him
23 to drag -- my body weight will drag him onto me.
24 Q.     So you put your body on top of his back and then
25 you moved to the right?

Page 101

1  A.    I believe so.
2  Q.    And then fell on your back with him on top of
3  you?
4  A.    Correct.
5  Q.    All right. And all the time you had your arm
6  around, as you say, his chin?
7  A.    I had it across his jaw bone (indicating),
8  across his chin line with my right primary hand
9  securing him against my body. He was like a turtle.
10 Q.    Where was your right hand?
11 A.    Securing my left hand to hold pressure upon his
12 jaw bone and to keep him secured.
13 Q.    Okay. At any time did you have your forearm on
14 his neck?
15 A.    No.
16 Q.    You sure about that?
17 A.    I am.
18 Q.    And it didn't slip down into the neck area?
19 A.    I moved it up when he started to bite my hand.
20 Q.    All right. So it was around his mouth?
21 A.    After he tried to bite my skin, I moved my arm
22 up so my watchband was in his mouth.
23 Q.    All right. And you are trained not to use choke
24 holds, correct?
25 A.    Correct.

Page 102

1  Q.    And it is your testimony you did not use a choke
2  hold?
3  A.    Correct.
4  Q.    Okay. And once you did that maneuver where you
5  flipped over on your back and he was on top of you with
6  his back on your abdomen, what happened then; was he
7  under some control at that point?
8  A.    **He was under control where all he could do is**
9  **flail his arms around, but he couldn't strike me.**
10 Q.    All right.
11 A.    **It was enough to free the officers.**
12 Q.    And they got out of the way?
13 A.    **Correct.**
14 Q.    And then what did you do?
15 A.    **Held him as Officer Mudra regained some**
16 **composure to try to assist. They had one cuff on him**
17 **that was still flailing around.**
18 Q.    All right. And the cuff was -- which arm was
19 cuffed?
20 A.    **I'm not sure.**
21 Q.    And were you still down; he was still on top of
22 you when he had the cuff on?
23 A.    **Correct.**
24 Q.    And were other officers showing up at this time?
25 A.    **They were -- finally somebody was able to go to**

1  central control to let them gain entry.
2  Q.    And was Omar handcuffed?
3  A.    Not yet.
4  Q.    What was going on?
5  A.    He was flailing around and still resisting.
6  Officer Chow -- Sergeant Chow was telling him to stop
7  resisting, stop resisting.
8  Q.    All right. And was Omar saying anything during
9  this whole episode?
10 A.    No, he was not.
11 Q.    All right. Do you know what set him off; I mean
12 was there something that happened, or he just
13 spontaneously started to fight Mudra?
14 A.    You'd have to really talk to Mudra. I don't
15 know.
16 Q.    We will. But I was just asking if you knew.
17 A.    I don't have any idea.
18 Q.    You don't have any idea. Was it something that
19 was said or was it an argument; you don't know?
20 A.    I do not know.
21 Q.    Okay. So but eventually he's handcuffed in the
22 front, right?
23 A.    Correct.
24 Q.    You wiggle out of it?
25 A.    No. Our plan was, as I explained to my people

1  when we're there, to roll him on his face with his
2  hands still in front of him, because his hands are
3  still weapons to us.  So once we all got an extremity,
4  the restraint chair was brought over and put in
5  position.  We rolled him on his face with his hands
6  underneath him.
7  Q.    All right.  And so at that point he was off of
8  you.
9  A.    He's off of me.
10 Q.    So he was rolled over from you --
11 A.    Correct.
12 Q.    -- onto the ground?
13 A.    Correct.
14 Q.    And how did his hands get underneath him?
15 A.    We rolled right over.
16 Q.    Well, the handcuffs would have prevented him --
17 A.    No.  He was handcuffed.
18 Q.    They would have prevented him from --
19 A.    Correct.  But he can still swing his arms.
20 Q.    Was he swinging his arm when you rolled him
21 over?
22 A.    He was still combative.  He was combative until
23 the point where we picked him up and set him in the
24 chair.
25 Q.    Okay.  When he was rolled over was anybody on

Page 107

1  was he voluntarily moving when he was put into the
2  chair?
3  A.    Not voluntarily getting into the chair, no.  He
4  was not.
5  Q.    He was not resisting at all when you put him in
6  the chair?
7  A.    No.
8  Q.    Did you see him -- was he limp when he was put
9  in the chair?
10 A.    Not limp.  No,
11 Q.    What was he?  Describe his movements.
12 A.    His body stayed upright in the chair.  He didn't
13 fall over.  I undid a handcuff.  And then when I undid
14 his handcuff I asked the officer to check, because I
15 wasn't comfortable then.  I felt there was a problem.
16 Q.    That was when he was in the chair?
17 A.    Right.
18 Q.    Or before?
19 A.    No.  That was when he was in the chair upright
20 now.  This is all happening like this, (indicating).
21 Q.    All right.  And then what did you do when you
22 thought there was a problem?
23 A.    I asked Officer O'Farrell to check for a pulse.
24 He did.  He said he had a pulse.
25 Q.    He had a pulse?

Page 108

```
1   A.    That's what Officer O'Farrell told me.
2   Q.    A weak pulse?
3   A.    Said he had a weak pulse.
4   Q.    A weak pulse.
5   A.    I think the first time he said he had a pulse,
6   because I asked him multiple times.  And then it went
7   to a weak pulse.  Then he even put his head on his
8   chest and said it was weak.  I wasn't comfortable with
9   that.  I uncuffed him and placed him now back on the
10  floor in the prone position.
11  Q.    Did you uncuff him first?
12  A.    Yes, I did.
13  Q.    And then he was laid down on the floor?
14  A.    Correct.  I immediately called the squad while I
15  was doing this.
16  Q.    And you had to have a number of people get him
17  off the chair and lay him down, right?
18  A.    Correct.
19  Q.    And then you called for a squad?
20  A.    Correct.  This is all done at the same time
21  while we're moving him.
22  Q.    Okay.  And you had a bite on your left arm?
23  A.    Correct.
24  Q.    Did anybody take a picture of that?
25  A.    Yes.
```

1           Go ahead.
2  A.     I can't answer that any different than I've
3  already answered it.  I don't know what you want.  I
4  mean, I've told you that in my opinion he did not
5  appear to be mentally ill.
6  Q.     I didn't ask you that.
7  A.     Okay.  Then I cannot answer your question.
8  We'll just let it go at that.
9  Q.     You cannot answer the question; okay, that's
10 fine.
11          MR. GILBERT:          Let me have
12      a moment here.
13          (Thereupon, there was a recess.)
14 BY MR. GILBERT:
15 Q.     Do you know what time he was booked, Omar?
16 A.     I believe it was around 3:20.
17 Q.     Okay.  And was he put in a regular cell at that
18 point?
19 A.     No, he was not.
20 Q.     Why?
21 A.     Because he was still a bondable person.
22 Q.     Okay.  Even though that -- isn't the procedure
23 that you put somebody in a cell after --
24 A.     No.  It's not the procedure.  If it's a bondable
25 person, they will keep them in a place where they can