IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

| | |
|---|---|
| ANITA ARRINGTON-BEY, etc., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:14-CV-02514 |
| ) | Judge Patricia A. Gaughan |
| THE CITY OF BEDFORD HEIGHTS,) et al., ) | |
| ) | |
| Defendants. ) | |

- - -

THE DEPOSITION OF RUSSELL NELSON

THURSDAY, APRIL 16, 2015

- - -

The deposition of RUSSELL NELSON, a witness, called for examination by the Defendants, under the Federal Rules of Civil Procedure, taken before me, Kristine M. Esber, a Notary Public in and for the State of Ohio, pursuant to notice, at the offices of Friedman & Gilbert, 55 Public Square, Suite 1055, Cleveland, Ohio, commencing at 3:53 p.m., the day and date above set forth.

- - -

HOFFMASTER & BARBERIC, INC.
THE GRAY'S BLOCK, SUITE 440
1360 WEST NINTH STREET
CLEVELAND, OH  44113
(216) 621-2550
FAX (216) 621-3377
1-888-595-1970



EXHIBIT F

Page 5

1  Q.    Third, I talk kind of slow because I grew up in
2  southern Ohio, but one thing that is important is for
3  us to try to talk one at a time, because again, it's
4  very hard on our court reporter to try to take down two
5  people talking at once.
6  A.    Okay.
7  Q.    If at any point you need to take a break, let us
8  know, but I don't think we're going to be here real
9  long.
10 A.    Okay.
11 Q.    Okay?
12 A.    Sure.
13 Q.    All right. And you have given us your address
14 and your phone. We're not going to put that on the
15 record, but you presently work at Lowe's in Bedford
16 Heights?
17 A.    Yes. That's correct.
18 Q.    How long have you worked for Lowe's?
19 A.    Six years.
20 Q.    All right. And has all of that been in Bedford
21 Heights?
22 A.    No. Almost three years in Bedford Heights and
23 three years in the Mentor store.
24 Q.    All right. And what's your present position?
25 A.    ASM, assistant store manager.

1  A.     Lachell, L-A-C-H-E-L-L, Williams.  And she's
2  still the current HR manager there.
3  Q.     Who was the store manager?
4  A.     David Summers, but he is no longer with Lowe's.
5  Q.     Okay.  Do you know where he is now?
6  A.     He works for Best Buy.
7  Q.     In the Cleveland area?
8  A.     Yes.
9  Q.     All right.  Would you have any idea how to
10 contact him, if necessary?
11 A.     Yes.
12 Q.     Okay.  Do you know which Best Buy store he's at?
13 A.     Macedonia.
14 Q.     How did you learn that Mr. Arrington-Bey had
15 been terminated?
16 A.     Just when we had posted his position.
17 Q.     Okay.  Did anybody talk to you about the reasons
18 for his termination?
19 A.     It was attendance.
20 Q.     All right.  Do you know if this occurred over
21 the course of his employment, or was it something that
22 was sort of more recent before he was terminated?
23 A.     No.  It was all -- he had basically not shown up
24 for work for a week and a half, a week or so.  So after
25 three days we consider that job abandonment.

Page 12

1  A.    Yes.
2  Q.    How did that come to your attention?
3  A.    Actually, I was walking down one of the aisles
4  and I had seen him talking to a few of the cashiers
5  near our entrance to our store -- or exit to our store,
6  rather.
7  Q.    Okay.  And did this raise any concerns for you?
8  A.    Yes.
9  Q.    Why is that?
10 A.    Well, he had come to the store, too, a week or
11 two prior to that, as well.  And it was just through
12 the grapevine kind of thing saying that he was kind of
13 -- just acting kind of strange.  He spent, you know, a
14 half hour, 45 minutes in the store and then, you know,
15 he kind of left.
16       But it's usually weird for somebody that soon to
17 be terminated to come back to the store, so that's kind
18 of why it drew attention.
19 Q.    Got you.  And so what was his demeanor or what
20 was he doing as he was talking to these cashiers when
21 you first saw him?
22 A.    Nothing.  He was just talking.
23 Q.    Okay.  And did you go over to where he was?
24 A.    Yes.
25 Q.    All right.  Did you have any conversation with

Page 13

1  him?
2  A.     Yes.
3  Q.     And tell me about that.
4  A.     Well, I went up to him and I said, hey, Omar. I
5  kind of greeted him. I asked him, you know, what he
6  was doing here. And he's like, oh, I'm just kind of
7  talking to people. I just asked him if there was
8  something I could help him out with, and he said no.
9         I don't remember how the conversation carried
10 from there. But he then started to talk about him
11 selling some gloves that he made to Lowe's and he was
12 trying to -- he made gloves that he was trying to sell
13 to Lowe's. And I was kind of confused at that point.
14 So I was asking him, oh, what do you mean? And he's
15 like -- he just kind of started talking a lot of
16 gibberish.
17        Then he said he ended up selling them to Kohl's
18 instead of Lowe's and they had these diamond tips on
19 the fingertips and he was selling them for $5,000 a
20 piece at Kohl's stores. And that's kind of when -- I
21 knew at that point that, you know, something was a
22 little off with him at that point.
23 Q.     Okay. What was his general demeanor as he was
24 talking to you?
25 A.     At first he was calm. He was calm. I mean we

1  were just kind of talking, you know.  And, you know, I
2  was just more concerned, just trying to get him to
3  leave the store.  I wasn't trying to escalate it at
4  all.  I just kind of was talking to him just like a
5  normal person, even though some of the things he was
6  saying were out of the ordinary.  I didn't say, well,
7  that's crazy or dumb or anything like that.
8       I just kind of just carried on the conversation,
9  nodding yes, oh, wow, that's cool, those types of
10 things.
11 Q.   Okay.  And then you made some efforts to try to
12 move him toward the door?
13 A.   Yeah.  Because we were by the exit, so I kind of
14 started walking down the main aisle.  And he kind of
15 was following towards me or following, you know, with
16 me.  And so I just kind of continued on the
17 conversation.  And then I just kind of walked around
18 the registers to the outside, the exit of the store.
19 Q.   Okay.  And he sort of followed along?
20 A.   Yeah, yeah, yeah.
21 Q.   As I understand it he kind of turned around and
22 came back in.
23 A.   Yeah.  We were outside.  It was a beautiful day
24 out.  It was like 80s.  I said, hey, why don't you go
25 home, enjoy the weather, you know, trying to get him to

1  anymore, kind of like brushing me off type attitude.
2  Q.    He didn't take a swing at you?
3  A.    No, no, no, no.
4  Q.    Okay. So he keeps going into the store and
5  following this customer. What happened from there?
6  A.    Well, he followed the customer down the aisles,
7  and at that point I knew I kind of had to take a
8  different measure. So I tried to call my store
9  manager. He didn't pick up the phone, his work phone.
10 I attempted to call his cell phone. He didn't pick
11 that up, either.
12        I just was looking down the aisles seeing Omar
13 talk to the customer still. He was still talking to
14 the same customer and boy. I don't know what was said
15 or anything that was going on there. I was far back.
16 And then Omar started to walk towards -- back to me
17 again.
18 Q.    Okay. So you were at least successful in
19 getting him distracted from the customer?
20 A.    Yeah, yeah.
21 Q.    Okay. So what happens from there?
22 A.    From there he came up to me and was -- I don't
23 remember what exactly was said, but the part I do
24 remember is he came up and said that Lowe's owed him
25 $200 and that he wanted to talk to Lachell.

Page 19

1  Q.    Okay. And what was your response?
2  A.    And I said, Omar, I was like, I don't know
3  anything about paychecks or anything like that. I
4  said, I can have Lachell give you a call and we can
5  talk about it further.
6  Q.    Okay. And did he respond at all?
7  A.    Yeah. That's when it really got escalated.
8  That's when he basically started yelling and screaming,
9  I want to see -- dropping F-bombs -- Lachell right now.
10 I want my money. That's kind of where it started to
11 get escalated from there.
12 Q.    Okay. So what happened then?
13 A.    From there he basically was yelling at the top
14 of his lungs, you know, I want my F-ing money, where is
15 Lachell at? I want to talk to her. And I continued to
16 talk to him, Omar, you know, calm down here. I don't
17 want to escalate this any further.
18       He just wasn't listening kind of to me at all
19 and was yelling and screaming. At that point a lot of
20 other customers and associates were noticing because,
21 you know, he's pretty much screaming. And he ended up
22 walking in front of our customer service desk down
23 aisle 2 where we had a bunch of stain gallons and five
24 gallons of stain on a blue cart. I ended up standing
25 in front of the aisle, kind of directing people away.

1  And then he just started kicking over things of
2  stain, picking them up, throwing them on the ground.
3  You know, stain is kind of splashing all over the
4  place. And then right there and then is when I called
5  911 at that point.
6  Q.  Okay. Do you have any recollection at all of
7  what you told 911?
8  A.  I just told them we had a gentleman in our store
9  that was, you know, going around destroying product and
10 he was a previous employee at this location.
11 Q.  All right. And what happened from there?
12 A.  Well, I was standing at the aisle there, and
13 people at customer service desk, I was trying to get
14 them away from the desk area, just telling them to kind
15 of spread apart. He ended up coming up aisle 2. As he
16 walked in front of me, he kind of swung at me there.
17 Q.  Okay.
18 A.  And then he continued to walk down the main
19 aisle. I was still on the phone with 911. As he was
20 walking down the main aisle of the store he just was
21 knocking all kinds of products over, you know, off all
22 the shelves all the way down the aisle.
23 Q.  Okay. Now, I've taken a look at some video that
24 was downloaded from the store.
25 A.  Yeah.

Page 21

1  Q.     And are you the one that did that?
2  **A.     I wasn't the one that did the video. I was the**
3  **person that was in that blue vest. That was me.**
4  Q.     And did somebody that looked like you kind of
5  follow Mr. Arrington-Bey around the store?
6  **A.     Yeah, yeah.**
7  Q.     When you say he kind of swung at you, what did
8  he do?
9  **A.     Well, as I was standing there on the phone, I**
10 **was like, Omar, listen, let's go. And he just kind of**
11 **went like that (indicating), just kind of lightly**
12 **jabbed me away. And I just kind of backed away like**
13 **that.**
14 Q.     He didn't actually hit you or make contact?
15 **A.     No, no.**
16 Q.     And did he come after you or try to assault you?
17 **A.     No. He just kind of continued walking right by**
18 **me and walked down the main aisle.**
19 Q.     Okay. Did you consider that a serious attempt
20 to hit you or --
21 **A.     Not a serious. It was more just kind of like a**
22 **gentle swing. I don't know if he was just trying to**
23 **scare me away or push me away type thing. It didn't**
24 **seem like he was actually trying to hit me.**
25 Q.     Okay. And what part of the store did that occur

1  in again?
2  A.    That was right in front of the customer service
3  desk and in front of the paint desk.
4  Q.    All right. And where did you go from there?
5  A.    That's when he walked down the main aisle
6  towards like our commercial lumber entrance/exit. And
7  that's when I followed him behind. I was just kind of
8  following him, directing people to stay down the
9  aisles, you know, and things like that. I was still on
10 the phone with 911 at the time, just kind of giving
11 them a description of what was going on.
12 Q.    Okay. And I think there's a scene depicted
13 where somebody is driving a fork lift down --
14 A.    Yeah. As he was going down the aisle knocking
15 all the stuff down, that's where he exited the
16 building, where the person was on the tow motor. And
17 he just picked up a bag of play sand or whatever it was
18 and kind of threw it on the tow motor and then
19 continued to walk out of the building.
20 Q.    Okay. And at that point he exited the building?
21 A.    Yes, yes. I followed -- I'm out in the exit
22 just to make sure, because we have employees and stuff
23 out there, things like that. So he just kind of exited
24 and I followed him out into the parking lot.
25 Q.    Okay. And that was the last time he was in the