**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| Anita Arrington-Bey, | ) | **CASE NO.  14 CV 2514** |
| | ) | |
| Plaintiff, | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| vs. | ) | |
| | ) | |
| City of Bedford Heights, et al., | ) | <u>**Memorandum of Opinion and Order**</u> |
| | ) | |
| Defendants. | ) | |


<u>**INTRODUCTION**</u>

This matter is before the Court upon the Motion for Summary Judgment of Defendants
Bedford Heights, Tim Honsaker, Maurice Ellis, Phillip Chow, David Leonardi, Jeffrey Mudra,
Cheryl Syndone, Cynthia Lee, and Carolyn Hill (Doc. 39) and the Motion for Summary
Judgment of Defendant Arnold Feltoon, M.D. (Doc. 45). This is a civil rights dispute. For the
following reasons, the motion for summary judgment of Bedford Heights and the individual
officers is GRANTED IN PART AND DENIED IN PART. Feltoon's motion is GRANTED.

<u>**FACTS**</u>

This case arises out of the death of Omar Arrington-Bey on June 21, 2013, while he was
in the custody of the Bedford Heights Police Department. Arrington-Bey's estate brings suit

against a number of police officers and corrections officers who were involved in Arrington-Bey's custody and care, the medical director of the Bedford Heights City Jail, and the City of Bedford Heights. Plaintiff asserts claims under 42 U.S.C. § 1983 for deliberate indifference to serious medical needs as well as for violation of various state laws.

### A. Incident at Lowe's and Arrington-Bey's arrest - Police Officers Ellis, Honsaker, and Chow

On the morning of June 21, 2013, plaintiff was driving Omar Arrington-Bey to school. Arrington-Bey requested that they first stop at the Bedford Heights Lowe's store, where he had recently been terminated, to pick up his last paycheck. Arrington-Bey went by himself into the store. Russell Nelson was the Assistant Store Manager on duty.

After Arrington-Bey entered the store, Nelson asked if he needed help with anything, and Arrington-Bey responded no. (Nelson Dep. at 12-13). According to Nelson, Arrington-Bey then began to talk disjointedly about selling gloves to Lowe's. (*Id.*). Arrington-Bey was calm at the time, and Nelson attempted to lead him out of the store. (*Id.* at 13-14). Once outside, Arrington-Bey told Nelson that he wanted his paycheck. (*Id.*). When Nelson told him that another employee would contact him about the paycheck, Arrington-Bey yelled that he wanted his money and went back into the store. (*Id.* at 18-19). Inside the store, Arrington-Bey jabbed at Nelson to get him away and then began kicking and throwing cans of stain as he walked down a store aisle. (*Id.* at p. 20-21). Nelson called 911 and followed Arrington-Bey down the aisles toward a commercial entrance/exit area. (*Id.* at 22).

Bedford Heights Police Department dispatchers received the initial 911 call from Lowe's at 9:27 a.m. (Honsaker Dep. at 16). Police officers Honsaker and Ellis responded to the dispatch call. Dispatch informed the officers that Arrington-Bey was out of control and damaging

-2-

property at Lowe's. (Honsaker Dep. at 23-27). As Honsaker entered the Lowe's parking lot, he received different descriptions of the clothing worn by Arrington-Bey, which was the result of Arrington-Bey changing his clothing. (*Id.*).  Honsaker spoke with a Lowe's employee in the parking lot who informed him that Arrington-Bey had left in a blue or black Mercury. (*Id.* at 27-29). Honsaker saw a dark colored Mercury matching the employee's description leaving the parking lot and followed it. (*Id.*). Honsaker stopped the suspect vehicle on Miles Road in Bedford Heights. (*Id.* at 29).

Ellis and Honsaker approached plaintiff's vehicle from the passenger side. (*Id.* at 32-33). Honsaker observed Arrington-Bey in the front passenger seat and his clothing matched the last description that Honsaker had received. (*Id.* at 33). Initially, Arrington-Bey was evasive and told Honsaker that he should be looking for a male in a red shirt. (*Id.* at 35). Honsaker explained that the male suspect from Lowe's had removed a red shirt and was now wearing a white tank top matching what Arrington-Bey was wearing. (*Id.* at 35).

Ellis asked Arrington-Bey to step out of the vehicle. (*Id.* at 36). Ellis was aware that a few minutes before, Arrington-Bey had been "creating havoc and chaos within Lowe's, and may have taken a swing at the manager," but he testified that Arrington-Bey complied with the request to step out of the vehicle and that he was calm when Ellis dealt with him outside of Lowe's. (Ellis Dep. at 68). The officers patted Arrington-Bey down, handcuffed him, and detained him. During the pat-down, Honsaker and Ellis discovered pills in a container. Honsaker did not ask what the medication was for because he did not believe it was important for him to know. (Honsaker Dep. at 39-41). He recalled Arrington-Bey stating that he took the medication for a psychiatric condition and that he had not taken his medications for several days and

-3-

possibly several weeks. (*Id.* at 43-44). The officers placed the pills back in Arrington-Bey's

pocket. (A. Arrington-Bey Dep. at 53).[1]

Ellis then asked plaintiff for Arrington-Bey's address and social security number. After

providing the information, plaintiff states that she told Ellis that Arrington-Bey was bipolar. (*Id.*

at 54) Ellis asked plaintiff what kind of medication Arrington-Bey was on, and she informed him

that Arrington-Bey was on Seroquel but that he had not been taking his medication. (*Id.* at 54-

55).[2]

Plaintiff returned to the Lowe's parking lot and waited in her car while the officers

continued their investigation. During the investigation, Arrington-Bey was detained in the back

of Honsaker's cruiser. Arrington-Bey "did not stop talking" and "was rambling and ranting and

raving about every possible topic he could think of." (Honsaker Dep. at 43). Arrington-Bey

became angry if Honsaker interjected or responded. He talked about internet businesses where he

made lots of money, and made a comment about a million dollar cell phone. He said his father

was the son of the devil or the son of Satan, that he invented the thugs, and that he could be

looked up on the internet "as 310" or "710." He also said "white folks are crazy," and "the way

us black folks fool you white folks is just we put a 1 in front of every number that means

something and you can't figure out the numbers." (*Id*. at 54–55, 63–64). While Arrington-Bey

sat in the cruiser, a man came up to the window asking about the suspect from inside Lowe's.

---

1    Ellis testified that he gave the pills back to plaintiff.

2    Ellis recalled that plaintiff told him it was "some type of mental medication."
     Ellis testified that he did not know what type of medication it was or if Arrington-
     Bey had taken anything. Ellis acknowledged that, according to plaintiff,
     Arrington-Bey had some sort of psychological, psychiatric, or mental disability.
     (Ellis Dep. at 46–48).

Arrington-Bey screamed, swore, and threatened the man. (*Id.* at 65).

Arrington-Bey's behavior led Honsaker to ask plaintiff whether Arrington-Bey was on any psychiatric medication. (Honsaker Dep. at 46-49). Plaintiff testified that she informed Honsaker that Arrington-Bey is bipolar and had not been taking his medication. (Arrington Bey Dep. at 54-56). During Honsaker's deposition, he admitted that the nervous non-stop talking could be related to a psychiatric issue:

> Q.     So did you put two and two together and think that he might have a
>        psychiatricproblem, based on what you saw?
> A.     Sure, based on his actions that he may have had a problem, sure.

(Honsaker Dep. at 49). He also agreed that not taking medications "could present a problem." (*Id.* at 44). Arrington-Bey was agitated by plaintiff's presence in the parking lot, so Honsaker approached plaintiff's vehicle and asked that she leave the parking lot. (*Id.* at pp. 46-48). Plaintiff then left.

As part of the investigation, Ellis obtained a written statement from Russell Nelson. (*Id.* at 53). In the statement, Nelson stated that Arrington-Bey appeared to be "not mentally stable."(Nelson Dep. at 35-36, 38–39; Statement of Russel Nelson). Nelson also told Ellis that, when Arrington-Bey had come into the store earlier, he had a "certain look on him that [Nelson] had not seen before." (Ellis Dep. at 51). Nelson gave his written statement to Ellis, and Ellis testified that he handed the statement to Honsaker without Ellis reading it. (*Id.* at 53, 55).

Police officer Chow was the supervising officer at the arrest scene. He knew that Arrington-Bey had been tearing up the Lowe's store and recalled Honsaker saying at the scene that Arrington-Bey "kept talking and talking," "talking about everything," "everything and anything." He also heard Arrington-Bey say he was a state trooper, which Chow "just

dismissed." (Chow Dep. at 20, 25–28). Someone told Chow that Seroquel had been found on Arrington-Bey during the pat-down. (*Id*. at 34–35). Chow did not direct Arrington-Bey to be taken to a hospital, and Honsaker proceeded to the jail.

### B.  Arrington-Bey's detainment at Bedford Heights Jail.

### 1.  First Shift - Police Officers Honsaker, Chow, and Leonardi and Correctional Officers Lee and Hill

When Honsaker got to the jail, Correctional Officers Lee and Hill were on duty and received Arrington-Bey. (Hill Dep. at 37-38). The record is not clear as to whether Honsaker told anyone at the jail about the medication that he and Ellis had found on Arrington-Bey or what it was for. He did not recall specifically telling anyone about the medication, but he later testified that normally he would tell the jail this information, and he did not know why this situation would be any different. (Honsaker Dep. at 44-45, 51–52). Honsaker did recall telling the jail staff that Arrington-Bey had been talking non-stop about all kinds of crazy things. (*Id*. at 68). According to Lee, Honsaker told her that they "were going to keep the cuffs on him until [they] got him where he was going. And that he was, you know, just babbling constantly from wherever he picked him up until he got into the garage." (Lee Dep. at 41). Lee was also aware that Arrington-Bey "went crazy" at Lowe's. (*Id.* at 55).

Hill described Arrington-Bey as agitated with Honsaker due to his arrest. (Hill Dep. at 37-38). Honsaker also told Hill that Arrington-Bey had been rambling and talking nonsense in the back of the cruiser. (*Id.* at 37). Hill decided to delay booking and screening Arrington-Bey because of his agitated state and because only two female correctional officers were available. (*Id.* at 39). Hill acknowledged that it is important to do a complete medical/mental health booking process because inmates could have various medical problems, such as suicidal

ideation, contagious diseases, or drug use. (*Id.* at 26).

When Lee searched Arrington-Bey upon his arrival, she found the pills that Ellis and Honsaker had found during the pat-down. She did not ask him what they were for, although she acknowledged that knowing what pills are for is "an important piece of information that [she] need[s] to know concerning the medical and mental health situation" of someone brought in for booking. (Lee Dep. at 52). The pills were brought to the booking area and held with Arrington-Bey's property. Lee did not call the nurse or the doctor, (*id.* at 52–53, 55), although she did tell Hill that Arrington-Bey came in with pills on his person. (Hill Dep. at 40–41).

Based on what Honsaker had told Lee about Arrington-Bey's behavior, she put him in the segregation room instead of doing the booking and initial screening. (Lee Dep. at 48). In fact, Lee testified that she thought Arrington-Bey might have a mental problem based on what Honsaker told her. (*Id.* at 49).[3] She knew that it is important to do a complete screening of a new inmate when the inmate is booked into the jail both for the health and safety of the inmate, and the security and safety of the jail itself, because "you would know some of the medical issues that they had." (*Id.* at 23, 24). Lee testified that it is a correctional officer's duty to look for signs of mental illness. (*Id.* at 32).

Once in the holding cell, Arrington-Bey's cuffs were removed and so was his belt. Hill stated that Arrington-Bey danced and acted like he was performing a striptease. Hill asked him to stop and he complied. While in the holding cell, Arrington-Bey sat and talked to himself,

---

3    Lee testified that the following would be signs of potential mental illness: non-stop, incoherent rambling, talking repeatedly, making no sense, talking bizarre, talking nonsense, someone saying that his father is the son of the devil, yelling a lot and crying a lot, or if she was told that somebody is on psych medication and he has not had it in days, probably weeks. (Lee Dep. at 32–34).

flirted with the female correctional officers, talked about a $1 million song or contract he was involved in, sang and rapped, and kicked the cell door a few times. (Hill Dep. at 47, 53-57). Hill did not consider Arrington-Bey's conduct to be a behavioral problem that indicated a mental health problem. (*Id.* at 57).

At one point, Arrington-Bey began yelling, kicking his cell door, and banging a cup on the wall because he wanted to use the restroom. (Honsaker Dep. at 72-74). Because there were two female correctional officers on duty, Honsaker was contacted to assist and bring Arrington-Bey to the restroom. Assistant Chief Leonardi, Honsaker, and Chow retrieved Arrington-Bey from his holding cell and brought him to the restroom. Arrington-Bey explained that he was upset because he had requested to use the restroom thirty minutes before but did not receive a response. He also told Chow that he wanted his cell phone because there was a million dollar plan on it. (Chow Dep. at 43-44).

Honsaker stated that Arrington-Bey was agitated because Honsaker was watching him while using the bathroom. (Honsaker Dep. at 72-74). In response, Arrington-Bey used his hand to shake his penis and asked Honsaker if he would like to hold it for him. (*Id.*) Honsaker acknowledged that Arrington-Bey was a little violent at the point that he was called in to escort him to the restroom. (*Id.* at 76). When Arrington-Bey was finished using the restroom, the officers escorted him back to the holding cell. (*Id.*) According to Honsaker, Arrington-Bey was no longer agitated and thanked the officers for allowing him to use the restroom. (*Id.* at 74-75).

Assistant Chief Leonardi was on duty at the same time as Hill and Lee. He had heard that Arrington-Bey was engaged in bizarre behavior, about the pills, or about being bipolar, or that he may have had mental health problems. (Leonardi Dep.at 71–72). Leonardi knew Arrington-Bey

-8-

had been "dumping stuff over in Lowe's," and that "he was aggressive." (*Id.* at 76–77). Hill reported that she and Lee informed Leonardi about Arrington-Bey, and Leonardi simply instructed Hill and Lee to leave him in the interview room until he calmed down. (Hill Dep. at 39–40). Leonardi knew Arrington-Bey had not been booked over two hours after arriving at the jail. Despite the required initial medical screening, Leonardi said that "if he was noncompliant and whatever the reason was, then no, there was no screening." (Leonardi Dep. at 78).

Approximately an hour after Arrington-Bey arrived at the jail, Leonardi heard him banging loudly on the door. He could hear the noise through two heavy doors, from outside the jail in the police department. Leonardi went into the jail and saw Arrington-Bey pounding his feet against the door of the interview room. Leonardi asked what the problem was, and Arrington-Bey responded with racial slurs. Leonardi responded by pulling the restraint chair to the area outside of Arrington-Bey's cell. He told Arrington-Bey that if he continued the behavior, they would put him in the restraint chair. (Leonardi Dep. at 72–75).

Leonardi heard the correctional officers in the jail in the early afternoon calling for a rescue squad and the restraint chair. He assumed that the call pertained to Arrington-Bey and that Arrington-Bey was headed to the hospital. He thought that Arrington-Bey might have hurt himself, based on the behavior he saw him engaging in earlier in the morning. When Leonardi got into the jail, he learned that another inmate was headed to the hospital. (Leonardi Dep. 80–83). Leonardi testified that when an inmate is "constantly rambling" and if inmates are "just by themselves just talking to nobody," these are indicators of mental health issues. (*Id.* at 136–137).

### 2.  Second Shift - Correctional Officers Mudra and Sindone

At approximately 3:00 p.m., Correctional Officers Sindone and Mudra began their shift,

relieving Lee and Hill. (Sindone Dep. at 19; Mudra Dep. at 21). Lee warned the second shift that Arrington-Bey was combative and to use caution. (Lee at 53). Hill also briefed Mudra. She told him how long Arrington-Bey had been in the interview room, how he had been acting, that he had been talking to himself all day, and that he did not like white people. She told Mudra not to remove Arrington-Bey from the interview room unless two officers were on hand because Arrington-Bey was "a lot agitated." She also told Mudra that Arrington-Bey should be handcuffed if he was escorted out. (Hill Dep. at 59–61, 62).[4] When Hill left at the end of her shift, Arrington-Bey was being loud and kicking the door. (*Id.* at 61–62). It is undisputed that no staff member provided or called for medical or mental health assistance to Arrington-Bey during the first shift.

When Sindone arrived at work, Mudra told her that Arrington-Bey was isolated in the interview room because he had been throwing paint at Lowe's and had been fighting with police when he was brought in. Sindone also testified that Mudra told her he had been warned by the first shift that the correctional officers were to use caution and double escorting with Arrington-Bey. Sindone witnessed Arrington-Bey's rambling, being loud, and acting bizarre through the intercom system. (Sindone Dep. at 24– 25, 27-28, 37, 55).

After a period of time, Sindone noticed that Arrington-Bey calmed down and was quiet in his cell. (*Id.* at 41). She and Mudra then served him food, using the double escorting technique

---

4       Mudra claimed he did not remember Lee or Hill telling him that Arrington-Bey
        was not to be removed from the cell without two officers present, that Lee and
        Hill were concerned for their safety around Arrington-Bey, or that he had not
        been booked because of agitated behavior. Mudra says he only knew that
        Arrington-Bey was loud. (*Id.* at 29, 51–52).

-10-

by going to his cell together. Arrington-Bey ate the food with his hands and maybe also with his feet. Sindone recalled that he had food all over him. Though she testified in her deposition that she did not know why he did not have a spoon, she stated in her Bureau of Criminal Investigations interview that he did, in fact, have utensils available to him when he ate with his hands and/or feet. (*Id.* at 32, 45- 46; *see also* Exhibit 1 – Track 3, Audio recording of Sindone Interview by Ohio Attorney General's Office Bureau of Criminal Investigation). Sindone testified that she gave Arrington-Bey extra food and that this was a tactic she used to calm down detainees that she felt had mental health issues. (Sindone Dep. 44–45). Sindone did not consider Arrington-Bey's actions as unusual in a jail setting. (Sindone Dep. at 41; 44-46).

Mudra recalls hearing Arrington-Bey sing while in the holding cell and saw him doing pushups. (Mudra Dep. at 27-28; 51). Mudra did not find Arrington-Bey's behavior to be unusual. (*Id.*)  Mudra informed Arrington-Bey that they would be getting him booked and processed shortly. (*Id.*) Arrington-Bey then became quiet and calm in the holding cell. (*Id.*)

At around 3:30 p.m., Mudra removed Arrington-Bey from the holding cell and proceeded to book and process him. (Mudra Dep. at 36). The booking process included the completion of Arrington-Bey's initial medical screening. (*Id.* at 39-40, *Bey initial medical screening form*). Arrington-Bey responded "no" to inquiries regarding whether he had seen a doctor for any psychiatric issues or was taking medication for a psychiatric condition. (*Id.*) Mudra stated that the booking form's "remarks" section was to be used to describe issues such as suicide risk or "if they're acting funny." (*Id.* at 39–41). Mudra did not put anything in the "remarks" section about Arrington-Bey's behavior.

During booking, Mudra also completed a property form. Mudra filled out a second

property form later when he found Arrington-Bey's pills in Central Control, along with other property. The second form noted pills in Arrington-Bey's possession. Mudra did not ask Arrington-Bey what the pills were for, did not fill out a new medical screening form to note the pills, and did not notify a nurse of the pills. He does not recall informing Sindone, the officer in charge, or Leonardi about the pills. Mudra was not concerned about them because he did not know what they were for. (*Id.* at 43–49, 52). He acknowledged, however, that it is important to do a screening for inmates at the first opportunity with regard to medical and mental health, and that policies require screening for serious medical or mental health conditions because of risks such as contagion or suicide. (*Id.* at 15–16).

Throughout the booking process, Arrington-Bey was compliant and cooperative. After booking was complete, Mudra returned Arrington-Bey to the holding cell. (*Id.* at 50).

**C. Arrington-Bey's assault of Officers.**

At around 6:30 p.m., Mudra asked Arrington-Bey if he would like to make a phone call because Mudra wanted to see him bonded out. (Mudra Dep. at 51.) Arrington-Bey replied that he would like to make the phone call. (*Id.*) Mudra took Arrington-Bey out of the interview cell and walked with him approximately 20 to 25 feet to the booking desk where a phone was available. (*Id.* at 52-54.) Mudra did not handcuff Arrington-Bey as he did not perceive him to be a threat. (*Id.*) Arrington-Bey inquired as to where his cellphone was and Mudra told him he did not know. (*Id.*) According to Mudra, Arrington-Bey became agitated and decided that he wanted to go back to his cell rather than make a phone call. (*Id.*)

As they walked back to the holding cell, Arrington-Bey stopped, looked at Mudra, and told him he could break a man's neck seventeen different ways. (*Id.*) Mudra told Arrington-Bey

that he did not need to make that statement and he was going to try to find out where the cellphone was. (*Id.*) They stopped walking and Arrington-Bey suddenly grabbed  Mudra by the neck and slammed him to the floor. Arrington-Bey began choking  Mudra while on the ground.

After Mudra called for assistance,  Sindone left the control room and attempted to assist Mudra. (Sindone Dep. at 52). Sindone jumped on Arrington-Bey's back, and Arrington-Bey then pinned Sindone on the ground and began choking both her and Mudra. (*Id.*) Leonardi and other police officers responded and entered the jail area. (Leonardi Dep. at 93-94). Ultimately, Arrington-Bey was handcuffed with his hands in front of his body and placed in a restraint chair. (*Id.*) When placed in the restraint chair, Arrington-Bey's body remained in an upright position and the handcuffs were removed. (*Id.* at pp. 107-108). Leonardi detected a problem and asked an officer to check Arrington-Bey's pulse. (*Id.*) The officer reported a weak pulse. (*Id.*) Leonardi then immediately ordered that the officers take Arrington-Bey out of the restraint chair and place him on the floor in a prone position. (*Id.*) Leonardi had an emergency squad called for medical assistance, and an officer began to provide Arrington-Bey with resuscitation efforts. Emergency responders arrived and continued providing resuscitation efforts. (*Id.*) Arrington-Bey was taken to the hospital and later pronounced dead. (*Id.*)

After an autopsy, the coroner opined that Arrington-Bey "died as a result of a sudden cardiac event during a physical altercation in association with bipolar disease." The coroner found that Arrington-Bey's increased weight and coronary artery anatomy placed him at increased risk of such a cardiac event during the assault. (Autopsy Report).

### D.  Bedford Heights Mental Health Policies and Procedures

### 1.  Medical Staff

-13-

Bedford Heights Jail contracts with Dr. Arnold Feltoon to provide inmates with medical services. (Leonardi Dep. at 34.)[5] Under the medical service contract, Dr. Feltoon is to provide administrative supervision of medical services at the jail. This included reviewing medical protocols with jail personnel; performing in-service teaching on an as-needed basis; developing medical protocols for jail personnel, medication, and chart reviews; and performing an annual review of all of the jail's medical policies and procedures. (Feltoon Contract; Feltoon Dep. at 27-29; 32-36.) Bedford Heights Jail also provides on-site nurses for medical care and treatment of inmates. (Leonardi Dep. at 27-28; DeLuca Dep. at 13- 14.) The nurses evaluate inmate medical complaints, provide inmate medical information to Dr. Feltoon, and assist in providing inmates with medical care. (DeLuca Dep. at 13-14.) As part of the medical care provided, nurses are to respond to medical emergencies at the jail. (*Id.* at 29-30.) The jail provides mental health care intervention through Recovery Resources for inmates in need of mental health services. (Leonardi Aff., with attached Policy 4.1.7 "Jail Policy")). Jail policies require that "[p]risoners evidencing signs of mental illness...shall be referred immediately to qualified mental health personel [*sic*]." (*Id.*).

_____

5    In addition to being the Medical Director for the Bedford Heights Jail, Feltoon also worked 30 to 35 hours per week as an ER doctor at the relevant time and served as medical director at approximately 20 additional jails. (Feltoon Dep. at 9–10, 15).

## 2. Intake Procedures

The jail's written policies regarding offender intake state that "[a]dmitting staff will be alert for offenders who display signs of mental illness ... and will refer them to ... medical staff for immediate evaluation while maintaining direct, constant supervision at all times." (Jail Policy 3.2.5). Similarly, the jail is to identify offenders requiring special management "at the time of intake, or as soon thereafter as possible." (Jail Policy 3.2.5). The policies describe severely disturbed or mentally ill offenders in need of special management as those "who present a danger to themselves or others or are incapable of attending to basic physiological needs because of a mental or emotional problem." (*Id.*)

Jail policy requires that "[a] preliminary health receiving screening shall be completed by health trained personnel on all persons upon reception...to determine if the prisoner is experiencing any physical or mental disorders." (Jail Policy 3.1.1; Feltoon Dep. at 61-66, *Exhibit 1, initial screening form*.) An initial intake screening form is to be completed by the booking officer. This form asks whether the inmate has recently seen a medical provider for a psychiatric condition or is currently taking prescribed psychiatric medications. (Feltoon Dep. at 69–70). The jail's medical staff is to conduct training on the health intake form annually, and all such training is to be documented. (*Id.* at 71-72).

Offenders entering the jail in possession of prescription medication are permitted to continue taking the medications only after verification by the medical staff of need, ownership, and content of the prescription. (Leonardi Aff., Policy 4.1.3 – Health Care Medical Services.) If an inmate enters the jail with loose pills of an unsubstantiated nature, the medical staff is to verify the nature and reason for the pills. (Deluca Dep. at 32, 66-67; Feltoon Dep. at 68). If

-15-

medical staff is not available, then an officer is to call Feltoon. (Deluca Dep. at 31-32).

### 3. Police Policies and Procedures

Testimony regarding the police department's policies for dealing with mentally ill people is somewhat contradictory and not entirely clear.[6] For example, Honsaker testified that the only time protocol required him to take a suspect to the hospital rather than to jail is when that person indicates to an officer that he or she is "going to do some type of harm or danger to themselves or others." (Honsaker Dep. at 50). Ellis stated, however, that if he knows a suspect is mentally ill, then he requests for a rescue squad to attend to the person rather than arresting him. The squad will determine whether the suspect needs to go to the hospital. (Ellis Dep. at 69–70).

The protocol regarding when a transporting officer must inform the booking people about a suspect's mental health issue is also unclear. Chow, Leonardi, and Ellis testified that there is no requirement that an arresting officer give information to jail staff about any mental health issues or medication for mental illness. (Leonardi Dep. at 66–67; Chow Dep. at 47– 48; Ellis Dep. at 69–70).[7] Honsaker, however, testified that it is an officer's duty to give all the available information to the jail staff about an inmate, including information pertaining to psychiatric issues. (Honsaker Dep. at 50– 51, 52).

---

[6]     Ellis did not even know whether the police department had a policy regarding mental health, although he claimed that oficers are required to review their policies annually. He noted that the requirement to review policies is self-enforced without supervisory review. (Ellis Dep. at 24- 25). Similarly, Sergeant Chow was not aware of any de-escalation policies relating to people with mental health crises. (Chow Dep. at 17).

[7]     On the other hand, Chow stated that if there is a *medical* issue (as opposed to a mental health issue), then officers have to notify jail staff. (Chow Dep. at 47-48).

### 4. Jail Policies and Procedures

The jail policies and procedures for responding to mental health issues also seem to be applied on a somewhat ad hoc basis. Lee testified that if she suspected someone to be mentally ill, "talking about something totally different than what you're asking them," or engaged in "combative or angry" or "out of the ordinary" behavior, it would be proper to call Mobile Crisis or the counselor from Recovery Resources. If the nurse or counselor were on duty, it would be appropriate for them to see the detainee. If those individuals were not available, she would call Assistant Chief Leonardi. (Lee Dep. at 13, 14–17, 26). Lee acknowledged that if a person came into the jail with mental illness, being aggressive and combative, that person is put in segregation, and that putting someone into segregation triggers "the need to have a professional see them or some action taken to help them." (*Id.* at 29). Lee testified that she did not recall a single occasion where she ever called Dr. Feltoon regarding a mental illness situation in the jail, nor did she ever call 911 to take a prisoner to the hospital for a mental health crisis. (*Id.* at 31–32).

Hill testified that officers-in-charge can refuse to accept inmates brought in by agencies other than Bedford Heights if they are too combative or if they do not come to the jail with at least a three-day supply of psychiatric medication. (Hill Dep. at 12-15). Hill also testified that in cases involving Bedford Heights inmates without medication, it is important most of the time to get the medication situation clarified and dealt with immediately. (*Id.* at 16–17). Inmates would be permitted to call someone to get medication delivered to the jail. (*Id.* at 28–29). Further, Hill testified that though correctional officers are supposed to look for signs of mental illness (which she has not been trained to identify), the only way to ascertain whether someone is mentally ill is

if the inmate tells the correctional officers. If the inmate does not report his or her own mental

illness, then correctional officers do not independently look for signs of mental illness. (*Id.* at 19,

36). In her years at the jail, Hill never called Recovery Resources or Mobile Crisis and did not

remember calling Dr. Feltoon regarding mental health situations. (Hill Dep. at 33–34).

Sindone testified that correctional officers should handle unmarked medication by calling

the doctor or nurse right away when a new detainee comes into the jail and his property is

inventoried. (Sindone Dep. at 38). Sindone also testified that had she known Arrington-Bey

came in demonstrating bizarre, rambling behavior and that he might have had some psychiatric

medications with him, she would have called the nurse or doctor. (*Id.* at 39). Sindone further

testified that new detainees are segregated in isolation when they have "to be seen by medical or

if they're concerned that they could hurt themselves or hurt staff. Then they stay isolated." (*Id.* at

36–37).

Like Hill and Lee, during the ten years that he worked at the jail, Mudra does not recall

calling a counselor or mobile crisis for a detainee with a mental health issue. He never called 911

in relation to a mental health crisis for an inmate, and he only called Dr. Feltoon to tell him that

inmates were on medication. (Mudra Dep. at 19–20).

Many of the officers testified that they did not regularly review jail policies, and some

had not reviewed or had refresher training on the policies in years. For example, Mudra never

reviewed the jail policies after he was first hired in 2004, and he did not recall having any

refresher training on the policies. (Mudra Dep. at 13). Sindone also could not recall the last time

she reviewed jail policies. (Sindone Dep. at 58). It had "been a while," or some months, since

Lee last reviewed jail policies, and the last time that she did so, she was looking for something

-18-

specific. She did not review the mental health policies at the time, and her review was not required by the jail or any supervisors. Other than this limited search, she had only reviewed the policies when she was first hired, and then she read individual policies as they were added, at the time they were added. She has never had refresher training on the jail policies or procedures, and the jail does not require refresher training. (Lee Dep. at 17–20, 27). Hill testified that the last time she reviewed jail policies was a few years prior to her deposition and that she had not reviewed all of the policies during her most recent review. (Hill Dep. at 21-22).

### 5. Training

#### a. Training for Police Officers Ellis, Chow, and Honsaker

Chow testified that he did not recall any training for the police department regarding mental health crises before 2014, over a year after the death of Arrington-Bey. (Chow Dep. at 17). Ellis was a police officer for Bedford Heights for 23 years and served as a field training officer for the department for ten years, training new members of the department. (Ellis Dep. at 5, 9). In the training to become a field training officer, Ellis was not trained on dealing with mentally ill subjects. (*Id*. at 9–10). Over the course of his career with Bedford Heights, Ellis testified that he has had just one training course regarding mental illness online, but he could not recall when the training occurred. (*Id.* at 20-21). Ellis could not recall any red flags that suggest possible mental illness. (*Id.* at 71–72).

Honsaker was a police officer in Bedford Heights for 33 years. (Honsaker Dep. at 5). Honsaker says he has had some general training through the Ohio Peace Officer Training Academy (OPOTA), and believes he had some basic training regarding "emotionally disturbed people" in 2014. This training was "just for basic general information, knowledge." (*Id.* at 8, 9).

-19-

But Honsaker could not "remember anything specific" about such training before 2013, and stated that whatever the training was, it was "very basic, very general. More like seminars I guess than training," which took place "years ago." (*Id.* at 9, 14).

### b.  Training for Correctional Officers Hill, Lee, Mudra, and Sindone

DeLuca, the jail nurse, provides annual training and testing for correctional officers relating to medical emergencies, passing medications, infection control, and suicide prevention. (DeLuca Dep. at 46; 71-73). The testing and curriculum dealt only with mental health as it related to suicide prevention and depression, and did not address, for example, how to deal with someone who is having a psychotic episode.[8] (DeLuca Dep. 74-75, 76-79; *see also* Lee Dep. at 14:19-23).

Correctional officers recalled that Defendant Dr. Arnold Feltoon, the Medical Director at the jail, never provided any training on mental illness issues for correctional officers. (Lee Dep. at 14; Hill Dep. at 19). Indeed, Hill testified that Feltoon never provided any training at all for correctional officers. Dr. Feltoon admitted that he never gave training to correctional officers on specific signs of mental illness. (Feltoon Dep. at 76; Sindone Dep. at 58).

Hill, who became a correctional officer in 2000, testified that she had "a little" training on how to deal with mentally ill inmates, probably from the nurse. She could not recall much about the training or when it happened. It had been "a while." (Hill Dep. at 18-19). Hill testified that she had never been trained on how to spot indicators of possible mental health problems. (*Id.*

---

8       DeLuca's training includes a formal curriculum with written and video materials. (Id. at 71-73.) Once the nurse completes the training, correctional officers are tested on the curriculum via a written exam. (Id. at 77.)

at 19). She also was not aware of the policy on screening for medical and mental health conditions. (*Id.* at 21.)

Lee had training on suicide prevention, and said she had some training "a while" ago on indicators of potential mental health problems. When asked to name possible signs of mental illness, she stated, "Behavior, acting like combative or angry, you know, just -- like just kind of like total out of control, somebody just acting out of control, the things that we should do when their behavior is like out of the ordinary." She further stated that mental illness could be indicated by "when we're having conversations with them, when they're talking about something totally different than what you're asking them." (Lee Dep. at 10–14). Lee testified that she had no updated training on the mental health aspect of the booking process after she was first hired in 1998. (Lee Dep. at 20–23). She said that if an inmate reported a serious medical issue at the time of booking, however, she would have the nurse see the inmate.

During her twelve years as a correctional officer at the Jail, Sindone did recall receiving training at some point about how to deal with inmate mental health issues. She could not recall who taught the course, or where it was, and only remembered that the training covered "[j]ust the signs when they came in, what the steps were to do, make sure you call the doctor or the nurse, keep them, you know, away from the other population. So you kept them by themselves so they wouldn't hurt themselves or hurt somebody else." The only sign or symptom of mental illness she could remember was "rambling." (Sindone Dep. at 16–17).

Mudra testified that he did not recall receiving any training on how to spot indicators of possible mental health problems. (Mudra Dep. at 21). He also said that he received only on-the-job training by other correctional officers at the Bedford Heights Jail, and does not recall any

-21-

training on the jail's mental health protocols other than suicide prevention when he started

working in the jail in 2004. (Mudra Dep. at 9–12, 14). The only other training Mudra recalled

regarding mental illness and booking pertained to medications. Correctional officers were

supposed to find out if detainees were on medication, and if so, the correctional officers needed

to tell the medical department, which Mudra stated included the nurse, doctor, or counselors. (*Id.*

at 12–13).

At the time of Arrington-Bey's admittance to the jail, Leonardi had been the jail

Administrator for approximately one year. (Leonardi Dep. at 22). Prior to that position, he was a

police officer. Since coming on as Jail Administrator, Leonardi did not have any new training

regarding dealing with mentally ill or suspected mentally ill inmates. (*Id.* at 33–34). Leonardi

could not recall whether any of the online courses he required correctional officers to take dealt

with mentally ill inmates. (*Id.* at 34). Leonardi testified that he did not order any training for

correctional officers on mental health issues, and that he assumed correctional officers knew how

to handle mental health crises because "they've been in the facility." (*Id.* at 71).

### E.  Dr. Feltoon

Although Feltoon's contract specified that he was responsible for reviewing medical

protocols with jail personnel and performing in-service teaching on an as-needed basis, the

record reveals that he provided little such training with respect to mental health care. He relied

on nurses to provide medical training to jail staff, but he never trained the jail nurses on the

provision of mental health care. (Feltoon Dep. at 22, 23). Feltoon acknowledged that correctional

officers are on the front line for determining whether an inmate has a mental health issue and

must be trained about indicators for such issues because they are not medical personnel. (*Id.* at

-22-

54–56).[9] Yet, he never trained or had other medical staff train correctional officers on signs of mental illness or on providing access to medical care for detainees or inmates with mental health problems.[10] (Feltoon Dep. at 76;  DeLuca Dep. at 74–79; Lee Dep. at 14; Hill Dep. at 19; Mudra Dep. at 21; Sindone Dep. at 58). And, as noted earlier, no one, including Feltoon, required correctional officers to review the jail's medical/mental health policies, nor did any rules require regular review of jail policies for the nurse. (Mudra Dep. at 13; Sindone Dep. at 58; Lee Dep. at 17–20, 27–28; Hill Dep. at 21, 22; DeLuca Dep. at 22–23, 25–26).

Similarly, Feltoon did not provide training on initial medical screenings during intake within the last five to ten years. (Feltoon Dep. at 23–24). Feltoon testified that during initial intake, correctional officers identifying inmates with acute mental health problems should call him or EMS. Feltoon assumed correctional officers were trained in identifying these issues through correctional officer training, but he never verified that they were. (*Id.* at 29–32, 75). He has not witnessed this training and did not know what it entailed. (*Id.* at 29–30). Feltoon also testified that nurses provide correctional officers with most of the training on the initial intake form and that he did not know when or if the training occurred. If not provided, jail policies would have been violated. (*Id.* at 71-73). Correctional officers testified that intake training was limited to on-the-job training from other correctional officers. (*See, e.g.,* Mudra Dep. at 14, 9–12).

When asked about who delivered mental health services to the Jail, both Feltoon and

---

9       Feltoon acknowledged that mentally ill people do not always announce their illness, and that it is necessary to observe their behavior. (Feltoon Dep. at 54-56).

10      As noted, DeLuca has never done training for COs on mental health issues outside of suicide prevention.

DeLuca stated that Recovery Resources provides such services. (DeLuca Dep. at 17, 32; Feltoon Dep. at 22). DeLuca also testified that she would call Recovery Resources if a patient acted up or to verify medication and that Recovery Resources would evaluate inmates presenting serious mental health issues. (DeLuca Dep. at 32–36, 57–58). Recovery Resources, however, did not provide counseling, assessment, or therapeutic services to inmates at the Jail during the relevant time, and it only provided services in the jail during business hours, typically three days per week in 2013. (*See* Affidavit of Stephen S. Morse ¶ 8).

### SUMMARY JUDGMENT STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure, as amended on December 1, 2010, provides in relevant part that:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed .R.Civ.P. 56(a). Rule 56(e) provides in relevant part that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion ... [and] grant summary judgment if the motion and supporting materials—including the facts considered undisputed-show that the movant is entitled to it." Fed.R.Civ.P. 56(e).

Although Congress amended the summary judgment rule, the "standard for granting summary judgment remains unchanged" and the amendment "will not affect continuing development of the decisional law construing and applying" the standard.  See, Fed.R.Civ.P. 56, Committee Notes at 31.

-24-

Accordingly, summary judgment is appropriate when no genuine issues of material fact

exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*,

477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local

600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine

issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of
> informing the district court of the basis for its motion, and identifying those
> portions of "the pleadings, depositions, answers to interrogatories, and admissions
> on file, together with affidavits," if any, which it believes demonstrates the
> absence of a genuine issue of material fact

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution

will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the

nonmoving party.  The court must afford all reasonable inferences and construe the evidence in

the light most favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d

146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759

F.2d 557, 562 (6th Cir. 1985).  However, the nonmoving party may not simply rely on its

pleading, but must "produce evidence that results in a conflict of material fact to be solved by a

jury."  *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial

does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d

937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence of a

scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence

on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57 F.3d 476,

-25-

479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

### ANALYSIS

**A.** **Section 1983 claim against the individual police and correctional officer defendants[11]**

To prevail on a cause of action under § 1983, a plaintiff must prove "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Jones v. Muskegon Cnty.,* 625 F.3d 935, 941 (6th Cir. 2010) (internal quotation marks omitted). Here, there is no dispute that each of the individual officer defendants was acting under the color of state law at the time that Arrington-Bey was in the custody of the Bedford Heights police department. Defendants, however, argue that they are entitled to summary judgment because plaintiff cannot show that they acted with deliberate indifference to Arrington-Bey's serious medical needs in violation of the Fourteenth Amendment.[12]

Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cnty. v. Brown,* 520

---

11    References to "defendants" collectively in this section are to the individual police and correctional officer defendants.

12    Because of Arrington-Bey's status as a pretrial detainee rather than an inmate, his § 1983 claim must be brought under the Fourteenth Amendment's due process clause instead of the Eighth Amendment's cruel and unusual punishment clause. *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S. Ct. 1861, 60 L.Ed.2d 447 (1979); *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). The Eighth Amendment's deliberate indifference standard, however, is applicable to his claim.

-26-

U.S. 397, 410 (1997). It has both an objective and a subjective component. The objective component requires a showing that there existed a "substantial risk of serious harm" to a detainee's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). A claimant may satisfy the subjective prong by proving that "the official knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837. To defeat summary judgment, a plaintiff must establish facts from which a reasonable juror could conclude that the official: (1) subjectively perceived the facts that gave rise to the inference of the risk; (2) actually drew the inference; and (3) consciously disregarded the perceived risk. *Cooper v. Cnty. of Washtenaw,* 222 F. Appx. 459, 465–66 (6th Cir. 2007) (internal citations omitted). The official "may not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Farmer,* 511 U.S. at 843 n. 8.

"Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Horn v. Madison County Fiscal Court,* 22 F.3d 653, 660 (6th Cir.1994). A factfinder may infer that a prison official had the requisite knowledge from circumstantial evidence. *Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001). Although failure to follow administrative policies does not itself constitute deliberate indifference, evidence of such a violation may be considered as evidence of an officer's knowledge. *Bonner-Turner v. City of Ecorse*, 2015 WL 5332465, at *5-6 (6th Cir. Sept. 14, 2015).

The deliberate indifference standard lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Farmer,* 511 U.S. at 836. While it is not enough

-27-

for a plaintiff to show that an officer should have perceived a substantial risk to the detainee's health, she "does not need to show that the correctional officers acted with the very purpose of causing harm or with knowledge that harm will result." *Phillips v. Roane Cnty., Tenn.,* 534 F.3d 531, 541 (6th Cir. 2008) (quoting *Farmer,* 511 U.S. at 835). Such a standard "satisfies our twin goals of keeping the standard high enough so that it does not amount to mere negligence and low enough that it is possible for a plaintiff to survive summary judgment without proving his or her entire case." *Cooper*, 222 F. Appx. at 466-67.

**1.  Objective Prong**

The Sixth Circuit has defined a "serious medical need" under the objective prong as "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cnty*., 390 F.3d 890, 897 (6th Cir. 2004) (internal citations omitted); *Burgess v. Fischer,* 735 F.3d 462, 476 (6th Cir. 2013). The Sixth Circuit has long recognized that "psychological needs may constitute serious medical needs." *Horn v. Madison County Fiscal Court,* 22 F.3d 653, 660 (6th Cir.1994). *See also Clark-Murphy v. Foreback*, 439 F.3d 280, 292 (6th Cir. 2006); *Davis v. Oakland Cty.*, 1998 WL 180608, at *4 (6th Cir. April 7, 1998) ("Medical needs encompass treatment for mental illness.").

In their motion, defendants address the objective prong with only one conclusory statement that "the evidence fails to establish that Bey's medical issues were sufficiently serious as his behavior, particularly in a jail setting, would not have indicated to a lay person there was a need for emergency medical treatment." In their reply brief, however, defendants note that plaintiff has not substantiated her statements that Arrington-Bey had a bipolar diagnosis. They

-28-

also note that, when provided an opportunity during booking to self-report a mental health issue, Arrington-Bey denied any history of mental health treatment or medication.

Viewing the facts in a light most favorable to plaintiff, the Court finds that plaintiff has produced sufficient evidence from which a reasonable jury could conclude that Arrington-Bey suffered from a serious medical need at the time of his detention. Plaintiff testified that Arrington-Bey was diagnosed with bipolar disorder and had been treated, hospitalized, and prescribed medication for his condition. *See Haden v.* Green, 2011 WL 7563786 (D. Colorado June 13, 2011) (collecting cases where courts have held that a diagnosis of bipolar disorder satisfies the objective prong). And, as plaintiff notes, a lay witness, the Lowe's store manager, recognized that Arrington-Bey was "not mentally stable." The evidence also shows that Arrington-Bey's erratic behavior during his interaction with the officers led them to delay booking and to put him in a holding cell. According to Sindone, new detainees are segregated in holding cells when they have "to be seen by medical or if [the officers are] concerned that they could hurt themselves or hurt staff. Then they stay isolated." (Sindone Dep. at 36– 37). Moreover, Feltoon acknowledged that individuals with mental illness do not always self-report; thus, the fact that Arrington-Bey did not tell Mudra that he was bipolar does not support defendants' position. Finally, the coroner noted that Arrington-Bey died as a result of a sudden cardiac event during a physical altercation in association with bipolar disease. These facts are enough to create a genuine dispute of material fact on the objective prong.

### 2. Subjective Prong

A defendant's personal liability in a § 1983 action "must be based on the actions of that defendant in the situation that the defendant faced, and not based on any problems caused by the

errors of others." *Gibson v. Matthews*, 926 F.2d 532, 535 (6th Cir. 1991). Thus, the deliberate

indifference standard requires that the plaintiff show that each individual defendant had the

necessary mental culpability based on the facts and circumstances known to that officer.

*Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005). On a review of the

record, the Court finds that plaintiffs have established a genuine dispute of fact as to whether

each of the individual police and correctional officers had the requisite knowledge under the

subjective prong.

### a. Officer Honsaker

Defendants argue that Honsaker lacked the necessary subjective knowledge because none

of Arrington-Bey's conduct was so unusual for an arrestee that Honsaker perceived or could

infer that Arrington-Bey was suffering from a serious medical need requiring immediate medical

care. They also note that Arrington-Bey's calculated attempt to evade arrest by changing

clothing shows that he was mentally stable and cognizant of wrongdoing. Finally, they point out

that Honsaker observed periods where Arrington-Bey was calm, such as after plaintiff left the

parking lot or after Honsaker and the other officers escorted him to the restroom.

Reviewing the evidence in a light most favorable to plaintiff, however, the Court finds

that a reasonable jury could conclude that Honsaker subjectively perceived facts giving rise to

the inference that Arrington-Bey was at an excessive risk to his health. According to plaintiff's

testimony, Honsaker knew that Arrington-Bey was bipolar and that he had not taken his

medication in days or possibly weeks. Honsaker admitted that not taking psychiatric medication

could be a problem. Honsaker also admitted that it is an officer's duty to give all the available

information to the jail staff about an inmate, such as information pertaining to psychiatric issues.

-30-

(Honsaker Dep. at 50–51, 52). Yet, he did not recall telling anyone at the jail that medication had been found on Arrington-Bey, that plaintiff had told Honsaker that the medication was for Arrington-Bey's bipolar disorder, or that Arrington-Bey had not been taking his medication.[13]

In addition, Honsaker was aware of Arrington-Bey's erratic behavior in Lowe's and witnessed him ranting and raving in the cruiser as well as threatening the individual who came to the cruiser to ask about the Lowe's suspect. After being called to assist with taking Arrington-Bey to the restroom, Honsaker was aware that Arrington-Bey had been placed in a segregated holding cell—which was for inmates in need of medical help or who posed a risk of harm to themselves or others—and that he was still acting in an agitated and aggressive manner such that the female correctional officers on duty needed assistance. Finally, while Arrington-Bey was in the restroom, he asked Honsaker if he would like to hold his penis.

Despite Honsaker's statements that he perceived nothing unusual about Arrington-Bey's behavior for a detainee, the Court holds that a reasonable jury could conclude that Honsaker perceived a substantial risk of serious harm to Arrington-Bey but did nothing to assist him.[14]

---

13    Honsaker stated that he normally did tell the jail such information and that he did not know why this situation would be any different, but defendants have not produced any affirmative evidence showing that Honsaker did, in fact, relate this information to the correctional officers on duty.

14    In *Ruiz-Bueno III v. Scott*, 14-4149/14-4151 (6th Cir. Feb. 2, 2016), the Sixth Circuit noted that, on summary judgment, officers' testimony that a detainee did not appear to need medical attention should not be credited because the court must draw all reasonable factual inferences in favor of the plaintiffs. The court nevertheless found that the officers were entitled to summary judgment because the plaintiffs failed to meet their affirmative obligation to produce evidence of deliberate indifference. Here, plaintiff has met her obligation to come forward with such evidence.

"Whether, in fact, [he] perceived, inferred or disregarded that risk is an issue for trial." *Clark-Murphy v. Foreback*, 439 F.3d 280, 290 (6th Cir. 2006) (citing *Farmer,* 511 U.S. at 842, 114 S.Ct. 1970 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways ..., and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.")).[15] In *Clark-Murphy*, for example, the Sixth Circuit affirmed the denial of qualified immunity for an official who was aware that an inmate was in need of psychological services but did nothing to assist the inmate after filling out a psychiatric referral form even though the official continued to observe the inmate's disturbing behavior throughout several shifts. *Id.* at 288 (holding that Sergeant Tom Lauters was not entitled to summary judgment). While the official in *Clark-Murphy* witnessed the inmate's behavior over several days rather than in a single shift, as in this case, the court noted that a "prison employee doubtlessly could exhibit deliberate indifference toward an inmate in the course of one shift." *Id.* at 290-91.[16] Moreover, the Court finds that the period of Arrington-Bey's custody is more appropriately addressed by the jury in determining whether Honsaker consciously disregarded a risk.

---

15      *See also Cooper v. County of Washtenaw*, 222 Fed. Appx. 459, 467 (6th Cir. 2005) ("[O]nce actual knowledge of the risk [can] be shown at the summary judgment stage, the question of whether there was conscious disregard of that risk [i]s to be determined by the jury.")

16      In *Clark-Murphy*, the court held that two officials who were only exposed to the inmate for one shift were entitled to summary judgment. Both officials, however, responded appropriately to the situation and the plaintiff produced no facts showing that either disregarded evidence that the inmate was being deprived of necessary mental health care.

### b.  Officer Chow

According to defendants, Chow's observations of Arrington-Bey were too limited to indicate to him that Arrington-Bey was suffering from a "mental health emergency that required immediate medical care." As an initial matter, the Court notes that the test under the subjective prong is not whether an official perceives that a detainee is in the midst of an immediate medical or mental health emergency. *Parsons v. Caruso*, 491 F. App'x 597, 602-03 (6th Cir. 2012) ("The deliberate indifference standard...does not require a plaintiff to show that a defendant knew of an 'emergency situation.'...Common sense dictates that certain situations can present a substantial risk to a prisoner without being an emergency."). To the contrary, the question is whether a reasonable jury could conclude that Chow perceived facts that gave rise to the inference that Arrington-Bey was at an excessive risk to his health and that Chow consciously disregarded this risk. Taking the facts in a light most favorable to plaintiff, a jury could conclude from the circumstantial evidence that Chow meets this test.

As the supervising officer at the arrest scene, Chow knew about Arrington-Bey's actions in Lowe's, heard Honsaker saying that Arrington-Bey had been rambling about numerous topics, and heard Arrington-Bey say that he was a state trooper. Chow was also aware that Seroquel had been found on Arrington-Bey.[17] When Chow was called to the jail to help with escorting Arrington-Bey to the restroom, he knew that Arrington-Bey had been flashing his genitals. Moreover, a jury could conclude that he was aware Arrington-Bey was being held in an isolated holding cell and that he was acting so aggressively that the correctional officers on duty needed

---

17    Chow does not recall exactly when he found out that Seroquel had been found on Arrington-Bey, but he admits that it was before the altercation with the guards at 6:30 p.m.

assistance. After escorting Arrington-Bey to the restroom, Chow heard him say that he had million dollar plans on his cell phone. Despite his knowledge, Chow did not order that Arrington-Bey be taken to an emergency room rather than the jail, did not inform anyone at the jail about the Seroquel, and did not seek mental health assistance for Arrington-Bey. For these reasons, a jury could reasonably conclude that Chow was actually aware of a substantial risk to Arrington-Bey's mental health and did nothing to help him. Again, whether he, in fact, perceived, inferred, or disregarded the risk is for a jury to determine.

### c. Officer Ellis

Defendants argue that Ellis is entitled to summary judgment because he testified that he did not observe any behavior by Arrington-Bey that would indicate that Arrington-Bey was in the midst of an immediate medical or mental health emergency. Again, this is not the question under the subjective prong. Based on the circumstantial evidence, the Court finds that a reasonable jury could conclude that Ellis perceived that Arrington-Bey was at substantial risk. As Ellis approached plaintiff's car at the arrest scene, he witnessed Arrington-Bey "just rambling and talking." According to plaintiff's testimony, she informed Ellis that Arrington-Bey was on medication for his bipolar disorder and that he had not been taking it. Ellis also took Nelson's statement; Nelson informed Ellis of Arrington-Bey's bizarre and aggressive behavior in Lowe's and said that he believed that Arrington-Bey was not mentally stable. Ellis testified that his training required calling a rescue squad if a person was mentally ill, (Ellis Dep. at 69-70), but he did not call a squad or recommend that Arrington-Bey be taken to the hospital. These facts are sufficient to survive summary judgment.

-34-

### d.  Officer Lee

Defendants argue that Lee is entitled to summary judgment because she testified that she did not feel threatened by Arrington-Bey, that his behavior was common in a jail setting, and that nothing indicated to her that he was suffering from a mental health emergency. But viewing the circumstantial evidence in favor of plaintiff, a reasonable jury could conclude that Lee had the requisite subjective knowledge. When Honsaker brought Arrington-Bey in, he told Lee that Arrington-Bey had been "babbling constantly" since he was arrested. Lee was also aware that he had gone "crazy" at Lowe's. (Lee Dep. at 41, 55). Indeed, she testified that she thought Arrington-Bey might have a mental problem based on what Honsaker told her and admitted that much of the behavior that Arrington-Bey engaged in could be signs of mental illness. (Lee Dep. at 32, 49). *See Ruiz-Bueno*, 14-4149/14-4151 at *10 (holding that officer's testimony that he thought detainee looked physically ill established that officer was subjectively aware of substantial risk of serious harm to detainee).

When she searched Arrington-Bey, she found pills on him but did not ask what they were for even though she admits that knowing what pills are for is an important piece of information in understanding an individual's medical and mental health situation. Although she knew that it was important to do a complete screening of a new inmate when he is brought in, she put Arrington-Bey in a segregated holding cell and delayed booking because of what she knew about his behavior. While he was in the holding cell, Lee observed him performing a stripper-like dance and kicking the cell door. She also felt it necessary to call for assistance when Arrington-Bey needed to use the restroom. Lee testified that it is a correctional officer's duty to look for signs of mental illness, but despite the odd behavior that she witnessed Arrington-Bey engaging

-35-

in and her own suspicion that he might have a mental health issue, Lee never sought any medical or mental health assistance for him. These facts are sufficient to survive summary judgment.

### e.  Officer Hill

Like Lee, defendants maintain that Hill is entitled to summary judgment because she did not observe any behavior by Arrington-Bey that was so unusual that she believed he was in the midst of a mental health emergency. Again, plaintiff has produced enough evidence to create an issue of fact on Hill's subjective knowledge.

Viewing the facts in favor of plaintiff, Hill had essentially the same knowledge as Lee. She knew that: Arrington-Bey had been rambling and talking nonsense while he was with Honsaker; he was picked up for disorderly conduct at Lowe's; he was sufficiently agitated that she and Lee decided not to book him and instead placed him in a segregated holding cell; he came in with pills; he did a strip-tease dance in the holding cell; he kicked the cell door; the female officers needed assistance in taking him to the restroom; and he was talking to himself about a million dollar song or contract deal. She also warned Mudra that Arrington-Bey was agitated, that he had been talking to himself all day, and that he should be handcuffed if he was escorted out of his cell. Despite knowing that it is important to do a complete booking process to determine if an inmate has a mental health problem, Hill did not complete the booking process during her shift and did not seek any mental health assistance on Arrington-Bey's behalf.

### f.  Officer Leonardi

As with the other officers, defendants argue that Leonardi is entitled to summary judgment because he did not observe any behavior by Arrington-Bey that was so unusual that Leonardi believed he was in the midst of a mental health emergency. Leonardi is not entitled to

-36-

summary judgment. Viewing the evidence in favor of plaintiff, a reasonable juror could conclude that Leonardi was aware that Arrington-Bey had been engaged in strange behavior, that pills had been found on him, that he may have been bipolar or had mental health problems, and that he had been aggressive at Lowe's and was loud and aggressive in the jail. Hill and Lee informed Leonardi about Arrington-Bey's behavior, and Leonardi instructed them to delay booking and leave him in the holding cell until he calmed down. Leonardi was also aware that Hill and Lee needed assistance getting Arrington-Bey to the restroom and witnessed Arrington-Bey making racial slurs and showing his genitals while in the restroom. In fact, Leonardi testified that when he heard the correctional officers calling for a rescue squad and the restraint chair in the early afternoon, he assumed that Arrington-Bey was heading to the hospital. Based on Arrington-Bey's behavior, Leonardi thought that he might have hurt himself. This is enough evidence for a reasonable jury to conclude that Leonardi perceived facts that gave rise to the inference that Arrington-Bey was at an excessive risk to his health and that Leonardi consciously disregarded this risk.

### g.  Officer Mudra

Defendants argue that Mudra is entitled to summary judgment because Arrington-Bey was calm and compliant just before, during, and after the booking process and because Arrington-Bey told Mudra that he was not seeing a doctor for psychiatric issues and was not taking any psychiatric medications. Nevertheless, a reasonable jury could conclude that Mudra was aware from the first shift officers that Arrington-Bey had not been booked because of his strange and aggressive behavior and that the officers should be cautious and use double-escorting when interacting with him. Mudra also witnessed Arrington-Bey singing loudly in his

cell. Despite Mudra's knowledge about Arrington-Bey's behavior, he did not make any remarks on the booking form about it, even though he admitted there was a space on the form that was intended for such notes. Mudra also came across Arrington's Bey's pills during the booking process but did not ask him what they were for, did not fill out a new medical screening form to note the pills, and did not notify a nurse of the pills. Nor does he recall informing Sindone, the officer-in-charge, or Leonardi about the pills. Although he testified that correctional officers were to find out if detainees were on medication, and if so, to tell the medical department, Mudra said that he was not concerned about the pills "[b]ecause [he] [did not] know what they're for." (Mudra Dep. at 52). As noted above, however, Mudra cannot escape liability merely because he "refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Comstock,* 273 F.3d at 703 (quoting *Farmer,* 511 U.S. at 843 n. 8). Based on the circumstantial evidence, a reasonable jury could conclude that Mudra strongly suspected that Arrington-Bey was suffering from a serious mental health risk and consciously disregarded the risk. Thus, there is a genuine dispute of fact as to Mudra's subjective knowledge.

### h. Officer Sindone

Finally, defendants argue that Sindone is entitled to summary judgment because Arrington-Bey's actions were not unusual for a detainee and because he was calm throughout the booking process. Defendants also argue that Sindone never testified that she knew Arrington-Bey posed a danger to himself or others, even though he was in a holding cell and the first shift told them to use a double escort. According to defendants, "Sindone testified that there were numerous reasons a detainee was placed in a holding cell–only one of which was when a

-38-

detainee was a danger to himself or others–and she was unaware of why Bey was in the holding cell." Def.'s Reply Br. at 13 (citing Sindone Dep. at 36-37).

The Court finds that there is a genuine dispute of material fact as to whether Sindone had the requisite subjective knowledge. Initially, Sindone's testimony about the reasons a detainee would be placed in a holding cell supports plaintiff's position that she was aware that Arrington-Bey had a medically-related issue or was at risk of hurting himself or others:

> Q:     When you see that somebody is in one of those holding cells, does that mean they're not booked?...Isn't it normally the process that when somebody is booked, they go into population; they go into another area?
>
> A:     Yes. Unless there's, you know, *something they have to be seen by medical or if they're concerned that they could hurt themselves or hurt staff*. Then they stay isolated.

(Sindone Dep. at 36-37) (emphasis added). Similarly, the fact that the first shift had told Mudra and Sindone to use caution when dealing with Arrington-Bey shows that she knew Arrington-Bey's behavior was potentially dangerous. Sindone also knew that Arrington-Bey had been rambling and acting bizarrely earlier in the day. (Sindone Dep. at 25). Lastly, she witnessed him eating goulash with his hands and maybe with his feet, even though he had utensils available to him. From these facts, a jury could conclude that Sindone perceived facts giving rise to the inference that Arrington-Bey was at an excessive risk to his health and that she consciously disregarded this risk.

### 3.  Proximate Cause

Next, defendants argue that Arrington-Bey's attack of Mudra was an unforeseeable event that destroys the causal link between the officers' deliberate indifference and his cardiac arrest. They maintain that Arrington-Bey was never violent or combative with any of the officers prior

-39-

to the attack and had been calm and compliant during the booking process and that Mudra did not make any statement to Arrington-Bey that would have triggered the assault. Finally, they note that the officers immediately obtained medical attention for Arrington-Bey following the attack.

The Sixth Circuit, however, has consistently held that a plaintiff "need only demonstrate a link between each defendant's misconduct and [the plaintiff's] *injury*, which may include his death as well as the pain and suffering that preceded his death." *Clark-Murphy v. Foreback*, 439 F.3d 280, 292-93 (6th Cir. 2006) (emphasis in original) (citing *Boretti v. Wiscomb*, 930 F.2d 1150, 1154 (6th Cir. 1991) (holding that "physical pain and mental anguish [suffered] during the time he was denied [treatment] ... may constitute cruel and unusual punishment within the meaning of the Eighth Amendment"). As the Sixth Circuit explained in *Estate of Owensby v. City of Cincinnati*:

> Where the seriousness of a prisoner's needs for medical care is obvious even to a lay person, the constitutional violation may arise. This violation is not premised upon the "detrimental effect" of the delay, but rather that the delay alone in providing medical care creates a substantial risk of serious harm. When prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates the constitutional infirmity. In such cases, the effect of the delay goes to the extent of the injury, not the existence of a serious medical condition.

414 F.3d 596, 604 (6th Cir. 2005) (quotations omitted). Here, plaintiff has submitted sufficient evidence from which a reasonable jury could conclude that Arrington-Bey's need for mental health care was so obvious that there is a "link" between defendants' failure to obtain assistance for him and pain and suffering preceding his death.

Moreover, the Court also finds that summary judgment is not warranted with respect to

-40-

Arrington-Bey's death. As the Sixth Circuit has explained, "proximate cause, and its underlying foreseeability inquiry, is a question of fact for the jury." *James v. Meow Media, Inc.*, 300 F.3d 683, 692 (6th Cir. 2002). Based on the evidence in the record, a jury could conclude that the individual defendants' failure to obtain any mental health or medical care for Arrington-Bey despite his obvious need proximately caused him to lose control of his behavior and go into cardiac arrest. Indeed, the coroner concluded that Arrington-Bey died "*as a result of* a sudden cardiac event during a physical altercation *in association with bipolar disease*." Autopsy Report (emphasis added). Plaintiff's expert also opines:

> If the Jail staff had reacted reasonably to the frequent and multiple signs that Mr. Arrington-Bey was in an acute psychotic state, and aggressive as well, they could have arranged for consultation with a medical or mental health professional, arranged mental health evaluation, or taken some other course of action that would have resulted in immediate or almost immediate assessment and treatment for Mr. Arrington-Bey. The...death of Mr. Arrington-Bey ...[was] a direct result of the staff failures to react to the clear behavioral signs that Mr. Arrington-Bey was in an acute psychotic state and in need of treatment.

(Schwartz Report at 35). Thus, the resolution of this issue is better suited for trial.

### 4.  Qualified Immunity

Finally, the individual officer defendants argue that they are entitled to qualified immunity on plaintiff's Section 1983 claim. Qualified immunity can shield an official from suit when he "makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [he] confronted." *Id.* (quotations omitted). In deciding whether an officer is entitled to qualified immunity, a court's first step is to determine whether a constitutional violation has occurred.  *Neal v. Melton*, 453 Fed. Appx. 572, 575 (6th Cir. 2011). If a constitutional violation occurred, the court then asks whether that right was clearly established in light of the specific circumstances of the case. *Id.* Qualified immunity is appropriate "if the

-41-

law is not sufficiently clear such that a reasonable officer would be on notice that his conduct is clearly unlawful." *Id.* at 576. Here, the court considers whether the officer's action was objectively reasonable, "in light of the legal rules that were clearly established at the time it was taken." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 614 (1999)). If a defendant raises qualified immunity as a defense, the plaintiff bears the burden of demonstrating that it does not apply. *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).

As for the first prong of the qualified immunity test, the Court has already concluded that a question of fact exists as to whether the individual defendants violated Arrington-Bey's rights under the Fourteenth Amendment. With respect to the second prong, at the time of Arrington-Bey's death, detainees had a clearly established right to psychological treatment. *See Clark-Murphy v. Foreback*, 439 F.3d 280, 292 (6th Cir. 2006) (citing *Comstock,* 273 F.3d at 702 (noting that a "prison inmate has [an] Eighth Amendment right [to] be free from deliberate indifference to serious psychiatric needs")[18]; *Greason v. Kemp,* 891 F.2d 829, 834 (11th Cir.1990) (noting that "every reported decision handed down after *Estelle* and before [June 1985] ... recognized that deliberate indifference to an inmate's need for mental health care is actionable on eighth amendment grounds"); *see also Heflin v. Stewart County,* 958 F.2d 709, 717 (6th Cir.1992) (holding that "[t]here can be no doubt that in 1987 existing law clearly established

---

18      As noted earlier, the Supreme Court determined in 1979 that pretrial detainees enjoy protection under the Fourteenth Amendment's Due Process Clause that is analogous to the Eighth Amendment's protection against cruel and unusual punishment. *Bell v. Wolfish*, 441 U.S. 520 (1979).

the right [of inmates] ... to receive care for [ ] serious medical needs"); *Fitzke v. Shappell,* 468 F.2d 1072, 1076 (6th Cir.1972) (holding that "fundamental fairness and our most basic conception of due process mandate that medical care be provided to one who is incarcerated and may be suffering from serious illness")). Thus, the individual defendants are not entitled to qualified immunity.

### B.  Section 1983 claim against the City

Plaintiff also brings a § 1983 claim against the City and the Bedford Heights Officers in their official capacities. When a plaintiff sues local government officials and employees in their official capacity, the suit is treated as one against the municipality. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). Under *Monell v. Dept. of Social Serv.*, 436 U.S. 658 (1978), for a local government to be held liable for a § 1983 violation, a plaintiff must show that the government itself was the moving force behind the constitutional violation at issue. *Canton v. Harris*, 48 U.S. 378 (1989). The City's failure to train and supervise its officers "about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983" and constitute the moving force behind Arrington-Bey's death. *Shadrick v. Hopkins County, Ky.*, 805 F.3d 724, 737 (6th Cir. 2015) (quoting *Connick v. Thompson*, 563 U.S. 51, 131 S. Ct. 1350, 1359 (2011)).

Plaintiff's burden under § 1983 is to prove that the City's "failure to train and supervise its officers about the legal duty to constitutionally adequate medical care amounted 'to deliberate indifference to the rights of persons with whom the [officers] come into contact.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Specifically, she must prove that the City's

"training program and supervision were inadequate for the tasks the [officers] were required to perform, the inadequacy resulted from [the City's] deliberate indifference, and the inadequacy actually caused, or is closely related to, [Arrington-Bey's] injury." *Id.* at 738 (quoting *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008)). One way in which plaintiff can show that the City failed to adequately train its employees is by establishing "'a single violation of federal rights, accompanied by a showing that [the City] has failed to train its employees to handle recurring situations presenting an obvious potential' for a constitutional violation." *Id.* at 739 (quoting *Bd. Of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)). This method of proof "is available in a 'narrow range of circumstances' where a federal rights violation 'may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations.'" *Id.*

As the Supreme Court explained in *City of Canton*:

> It may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

489 U.S. at 390. The high degree of predictability can support both an inference that the policymaker's failure to train was the result of deliberate indifference as well as an inference of causation. *Shadrick*, 805 F.2d at 739.

In *Shadrick*, for example, the Sixth Circuit reversed the district court's grant of summary judgment in favor of a medical provider that contracted with a county to provide medical services to county inmates because a reasonable jury could conclude that the provider's failure to

-44-

adequately train its nurses resulted in the death of an inmate from an untreated staph infection. The nurses had received some on-the-job training when they were first hired, but the record showed that there was no ongoing training program. The nurses were also unable to identify and discuss the requirements of written policies governing their work, and two high-level supervisors denied any responsibility for training and supervising the nurses. As the court held, "[b]ecause it is so highly predictable that a poorly trained LPN nurse working in the jail setting utterly lacks an ability to cope with constitutional situations,' ... a jury reasonably could find that [the provider's] failure to train reflects deliberate indifference to the highly predictable consequence, namely, violations of constitutional rights." *Id.* at 742 (quotations omitted).

Here, defendants argue that the City's training program was adequate because it "provided annual training and testing for Correctional Officers relating to medical emergencies, passing medications, infection control, and suicide prevention. The suicide prevention training included training relating to mental health issues. The training included a formal curriculum with written and video materials. Once the nurse completed the training, Correctional officers were tested via a written exam on the curriculum." (Defs.' Br. at 26). Viewing the evidence in a light most favorable to plaintiff, however, the Court finds that she has produced sufficient evidence to create genuine issues of material fact on the elements of her § 1983 claim against the City.

Prior to Arrington-Bey's death, the record shows that the training on mental health was minimal, at best. For example, Chow could not recall any training for the police department regarding mental health crises before 2014, and in his 23 years as an officer, Ellis could recall only one training course regarding mental illness online. While Honsaker stated that he had some general training on "emotionally disturbed people" through OPOTA, he could not recall

-45-

anything specific about the training. In the jail, DeLuca's training on mental health was limited to suicide prevention and depression. Beyond that, the correctional officers could recall little, if any, training on how to deal with mentally ill inmates. For example, neither Hill nor Mudra were trained on how to spot indicators of possible mental health problems. While Hill had some training on dealing with mentally ill inmates, she could not recall much about the training or when it had occurred. Leonardi also had not had any new training on how to deal with mentally ill inmates since coming on as the jail administrator.

Despite Feltoon's responsibility to oversee training relating to mental health care at the jail, he did not train the nurses or correctional officers on the provision of mental health care. While he recognized that correctional officers are often the ones responsible for identifying inmates with mental health problems, he did not train them on indicators of mental illness. Nor did he provide any training on performing the initial medical screenings during intake within the last five to ten years. Although he believed that such training occurred as part of the correctional officer training, he did not know what this training entailed.

While the City had written policies for dealing with mentally ill inmates, the evidence shows that there was no training program in place regarding the policies. Many of the officers had not reviewed the policies in years, and no supervisors required the officers to review them. Moreover, the conflicting testimony from both police officers and correctional officers about the implementation of the policies shows that the lack of training meant that the policies were not necessarily followed. Indeed, the officers' across-the-board failures to follow the appropriate procedures in Arrington-Bey's case shows that the mere fact that the City had written policies in place is insufficient to ensure that an inmates' constitutional rights were not violated.

According to plaintiff's expert, the percentage of inmates with serious mental illness ranges from 20% to 40% of all inmates. (Schwartz Report at 14). As even Feltoon acknowledged, non-medically trained officers are often on the front line for identifying detainees and inmates with mental health problems and therefore must be trained to spot the indicators of mental illness. Unless the City provides the necessary training, the officers lack knowledge about the constitutional consequences of their actions or inaction in providing mental health care to inmates. Because both police officers and correctional officers in Bedford Heights inevitably came into contact with inmates and detainees with serious mental health issues, a reasonable jury could conclude that the City's training program and supervision were inadequate for the tasks the officers were required to perform.

Further, a reasonable jury could conclude that the inadequacy of the training resulted from the City's deliberate indifference. The evidence shows that the individual responsible for implementing the training programs on mental health care, Feltoon, did not take responsibility to appropriately train the nurses or officers to avoid violating inmates' constitutional rights to adequate mental health treatment for their serious mental health needs. Nor did he ensure that the officers received appropriate training from other sources, such as through correctional officer training. *See Shadrick*, 805 F.2d at 742 (finding genuine dispute of fact on whether inadequate training program resulted from provider's deliberate indifference where the evidence showed that none of the provider's administrators took responsibility to train the nurses or provide them with appropriate supervisory oversight).

Finally, the high degree of predictability that the failure to appropriately train the officers in providing adequate mental health care would result in constitutional violations supports an

inference of causation in this case. A reasonable jury could also conclude that the City's failure

to train the officers on the jails' policies led to the officers' failure to alert any medical staff of

Arrington-Bey's need for mental health care. Because the officers had not been trained to spot

any indicators of mental illness, a jury could find that they left Arrington-Bey in an isolation cell

for over nine hours while he was in the midst of a potentially psychotic episode and that the

failure to secure any medical assistance for him during this time led to the events giving rise to

his death. As plaintiff's expert opined:

> Th[e] [City's] failures led to a situation in the Jail in which detainees with serious
> or severe mental health problems were treated, if at all, on a "catch as catch can"
> basis, depending partially on which staff were on duty at the time and upon the
> untrained decisions of correctional officers operating without appropriate
> supervision or training and without appropriate procedural guidelines....The
> failures of ...the City...with regard to the provision of mental health services in the
> Bedford Heights Jail, led directly to the death of Mr. Arrington-Bey.... Those
> tragic results were a predictable consequence of the City, its officials, and Dr.
> Feltoon callously ignoring the situation in the Jail with regard to training,
> supervision, policy compliance and practices related to serious and severe mental
> health disorders.

(Schwartz Report at 35).

For these reasons, the City's motion for summary judgment on plaintiff's § 1983 claim is

denied.

### C.  Section 1983 claim against Dr. Feltoon

Plaintiff also brings a Section 1983 claim against Dr. Feltoon in his individual capacity.

Feltoon can only be held liable in his individual capacity if he "either encouraged the specific

incident of misconduct or in some other way directly participated in it." *Harvey v. Campbell*

*Cty., Tenn.*, 453 F. App'x 557, 563 (6th Cir. 2011) (citations omitted). At a minimum, plaintiff

must show that Feltoon "at least implicitly authorized, approved, or knowingly acquiesced" in

-48-

the denial of medical care to Arrington-Bey. *Id.*

It is undisputed that Feltoon was not aware that Arrington-Bey was a detainee at the jail until after his death. Plaintiff claims, however, that Feltoon can be liable under § 1983 based on his failure to adequately train the correctional officers on how to deal with mentally ill detainees and inmates. The Sixth Circuit, however, has consistently held that a defendant cannot be held liable in his individual capacity for the alleged failure to adequately train employees because doing so would "improperly conflate[] a § 1983 claim of individual supervisory liability with one of municipal liability." *Id. see also Miller v. Calhoun Cty.*, 408 F.3d 803, 817 n. 3 (6th Cir. 2005) (absent evidence of personal involvement in the underlying misconduct, failure-to-train claims against individual defendants are to be treated as claims against the county); *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 543 (6th Cir. 2008) (finding that "three supervisors' collective failure to train their employees" was not sufficient evidence to hold them liable in their individual capacities since there was no evidence any of them participated in the incident of misconduct).

Thus, Feltoon is entitled to summary judgment on plaintiff's § 1983 claim against him.

**D.  State law claims against the individual police and correctional officers**

**1.  Immunity**

Plaintiffs bring a claim for "willful, wanton, reckless, and negligent conduct" and for wrongful death against the individual police and correctional officer defendants. As employees of a political subdivision, the defendant officers argue that they are entitled to immunity under Ohio Revised Code § 2744.03(a)(6). Plaintiff, however, asserts that the exception to immunity in subsection (b) applies. Under that provision, employees are not immune if their "acts or

-49-

omissions were...in a...reckless manner." Ohio Rev. Code § 2744.03(a)(6)(b).

The Ohio Supreme Court defines reckless conduct as conduct "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson v. Massillon*, 134 Ohio St. 3d 380 (2012). For the reasons discussed above in relation to plaintiff's Section 1983 claim against the individual officer defendants, the Court finds there is a question of fact as to whether they acted with recklessness toward Arrington-Bey. *See Rouster v. Cty. Of Saginaw*, 749 F.3d 437, 447 (6th Cir. 2014). ("We have described the mental state of a prison official who has been deliberately indifferent to a prisoner's medical needs as akin to recklessness."); *Ruiz-Bueno*, 14-4191/14-4151 at * 20 (noting that deliberate indifference standard is analogous to Ohio's "reckless" standard in Ohio Rev. Code § 2744.03(A)(6)(b).

### 2. Merits

The officer defendants also argue that plaintiff's state law claims against them fail on the merits. They maintain that plaintiff cannot prove that Arrington-Bey's sudden assault and cardiac arrest were foreseeable and therefore they did not breach any duty to him. The officers also argue that plaintiff cannot prove that they were either the "but for" or the proximate cause of Arrington-Bey's death and that his sudden assault was an intervening event that breaks the causal chain between their actions and Arrington-Bey's death.

Disputed questions of fact remain on each of the issues that the officer defendants raise. A reasonable jury could conclude that it was foreseeable that Arrington-Bey's already fragile mental state as well as his pain and suffering would be exacerbated as a result of the officers' failure to secure any mental health assistance. For the reasons noted above, whether Arrington-

-50-

Bey's sudden attack of Mudra is an intervening cause that cuts off the officers' liability for his

death is a question better left to the jury. Ohio law is similar to federal law in this regard:

> Where the original negligence of the defendant is followed by the independent act of a third person which directly results in injurious consequences to plaintiff, defendant's earlier negligence may be found to be a proximate cause of those injurious consequences if, according to human experience and in the natural and ordinary course of events, defendant could reasonably have foreseen that the intervening act was likely to happen.

*Taylor v. Webster*, 12 Ohio St. 2d 53, 56 (1967). Thus, as the Ohio Supreme Court has

explained, "[w]here the facts are such that reasonable minds could differ as to whether...the

intervening act or cause constituted a concurrent or superseding cause and whether the

intervening cause was reasonably foreseeable by the original party guilty of negligence," the

case generally must be submitted to a jury and may not be resolved by summary judgment.

*Cascone v. Herb Kay Co.*, 6 Ohio St. 3d 155 (1983) (citations omitted).

### E.  State law claims against Dr. Feltoon

Plaintiff brings state law claims of negligence, wrongful death, and survivorship against

Feltoon. In her brief in opposition to Feltoon's motion for summary judgment, plaintiff clarifies

that her state law claims against Feltoon "rest upon [his] role in ensuring the training

and supervision of *non-caregivers* – namely, Jail COs – and his development of procedures

ensuring that *non-caregivers* allow inmates access to *caregivers*." (Pl.'s Opp. Br. at 12)

(emphasis in original). In other words, plaintiff's state law claims against Feltoon arise wholly

out of Feltoon's failure to adequately train the jail's correctional officers in dealing with inmates

and detainees with mental health issues and seek to hold him individually liable for such failure.

Similar to plaintiff's individual § 1983 claim against Feltoon, however, these claims improperly

conflate a claim of individual liability with one of municipal liability under *Monell*. As such, the

-51-

claims fail.

Moreover, one judge in this jurisdiction has held that a prison doctor who has no doctor-patient relationship with a decedent cannot be liable for medical negligence or wrongful death. *Stefan v. Olson*, 2011 WL 2621251 at * 19 (N.D. Ohio July 5, 2011). Without such a relationship, the plaintiff cannot establish a duty running from the defendant to the plaintiff, an essential element of the claims. *Id.* Thus, in *Stefan*, Judge Polster granted summary judgment to a prison doctor because the doctor "never met [the decedent] and did not even know who [he] was until long after [his] accident...As such, no patient-relationship existed...that could trigger medical negligence [or wrongful death] liability" against the doctor. Although Feltoon has not made such an argument in this case, the Court is in agreement with Judge Polster's analysis.

Thus, Feltoon is entitled to summary judgment on plaintiff's state law claims.

**F. State law claims and request for punitive damages against the City**

Plaintiff agrees that the City is entitled to summary judgment on all state law claims against it and that punitive damages cannot be assessed against the City.

-52-

**CONCLUSION**

For the foregoing reasons, the Motion for Summary Judgment of Defendants Bedford Heights, Tim Honsaker, Maurice Ellis, Phillip Chow, David Leonardi, Jeffrey Mudra, Cheryl Syndone, Cynthia Lee, and Carolyn Hill (Doc. 39) is GRANTED IN PART AND DENIED IN PART. The state law and punitive damage claims are dismissed as to the City. The Motion for Summary Judgment of Defendant Arnold Feltoon, M.D. (Doc. 45) is GRANTED.

IT IS SO ORDERED.


   /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated:   3/3/16

-53-